682 So.2d 910 (1996)
Dorothy M. DAVIS, Individually and on Behalf of the Estates of Her Minor Children, Franchacka Davis and Doris Davis, and Janet Tolliver, Individually and on Behalf of Her Minor Children, Natasha Tolliver, Shamara Tolliver and Jaron Tolliver, PlaintiffsAppellees,
v.
Ray A. SONNIER and Colonial Insurance Company of California, Defendants Appellants.
No. 96-515.
Court of Appeal of Louisiana, Third Circuit.
November 6, 1996.
*912 Edward Joseph Bourdeau, Walter John Rippas, Lafayette, for Dorothy M. Davis and Janet Tolliver, etc.
Troy A. Broussard, Lafayette, for Ray A. Sonnier et al.
Before YELVERTON, KNOLL and SULLIVAN, JJ.
SULLIVAN, Judge.
This personal injury suit arises from an automobile accident which occurred in Breaux Bridge, Louisiana, on May 15, 1993. The accident occurred on Begnaud Street at its intersection with Arnaud Street. Defendant, Ray Sonnier, who had stopped his 1982 Buick Century at the Begnaud Street stop sign and then rolled forward into the intersection, backed his car from the intersection when he realized that another automobile was approaching on Arnaud Street. Sonnier's car traveled in reverse approximately seven feet and struck the front bumper of a 1985 Mercury Topaz which had stopped behind his car at the stop sign on Begnaud Street.
The Mercury Topaz, which was owned by Darrell Davis, was being driven by his sister, Dorothy Davis (Davis). Her sister, Janet Tolliver (Tolliver), was in the front passenger seat. Davis' children, Doris and Franchacka Davis, were in the back seat along with Tolliver's children, Natasha, Shamara, and Jaron Tolliver.
Sergeant Kenneth Neal Lewis of the Breaux Bridge Police Department was dispatched to the accident scene. All of the occupants of the Davis vehicle denied to Sergeant Lewis that they had been injured in the collision. Sergeant Davis completed an accident report.
Two days later, on May 17, 1993, all seven occupants of the Davis vehicle went to the Our Lady of Lourdes Regional Medical Center (Lourdes) emergency room in Lafayette for medical evaluations. Each complained primarily of neck, low back, and shoulder pain. The next day, on referral by their attorney, Davis and Tolliver, along with their children who were in the accident, went to the Trauma Clinic in Lafayette. They filled out personal medical history forms and returned on May 20, 1993, for physical evaluations. They were all examined by Dr. Tyra Huval, who concluded that all seven persons were "fully disabled" as a result of the accident.
Also on May 20, 1993, Dorothy Davis, through her attorney, personally made written demand on Sonnier's automobile liability insurer, Colonial Insurance Company of California, for $1,653.67 in property damage to her brother's 1985 Mercury Topaz. She attached to the demand letter a Martin Chevrolet service department repair estimate listing nine allegedly damaged items, to-wit: wood panel, headlamp housing assembly, grille, radiator support, right front fender and stripe, right front bumper end, right front door and stripe, cowl panel, and labor cost for refinishing the damaged area. The estimate also noted that the dashboard was loose, but did not include a price to repair the dash. On August 2, 1993, plaintiffs' attorney sent a second letter to Colonial Insurance confirming that "some" of the claimed damage preexisted the accident. However, in the letter, the attorney maintained that the tie rod, axle, bumper, and dashboard were damaged in the accident. Interestingly, two of these items, the tie rod and the axle, were not listed as damaged on the original repair estimate nor were they included in the original demand letter. No repair estimate accompanied this second demand letter.
Plaintiffs, Davis and Tolliver, individually and on behalf of their respective children, filed this suit against Sonnier and Colonial Insurance on January 26, 1994. On October *913 20, 1994, the parties took the trial deposition of Dr. Raul Reyes, the owner of the Trauma Clinic. Trial of this matter was conducted on November 14, 1994. Prior to the taking of testimony, the parties orally stipulated to Sonnier's fault in causing the accident but not to his liability for the damages claimed by plaintiffs. Therefore, the issues at trial were whether Sonnier was liable for the claimed damages and, if so, the amount of the damages.
The trial court also decided to hold the record open for sixty days following trial so that the parties could depose Dr. Huval, the Trauma Clinic doctor who initially examined the plaintiffs. Davis, Tolliver, and Sergeant Lewis testified at trial. At the close of the testimony, the trial judge took the matter under advisement.
The parties took the telephone deposition of Dr. Huval on January 10, 1995. On January 8, 1996, the trial judge rendered written reasons in which he summarily concluded that the plaintiffs sustained minor injuries in the May 15, 1993 collision. The trial court awarded damages as follows:

 Pain, Suffering
 and Inconvenience Medical Expenses
Dorothy Davis $1,200.00 $919.27
Doris Davis 250.00 607.22
Franchacka Davis 250.00 367.22
Janet Tolliver 500.00 578.84
Natasha Tolliver 250.00 393.00
Shamara Tolliver 250.00 393.00
Jaron Tolliver 250.00 393.00

The total award amounts to $6,601.55. The trial court also assessed defendants with all court costs, which specifically included expert witness fees of $500.00 each for Dr. Reyes and Dr. Huval and court reporter fees of $389.50 for Dr. Reyes' deposition and $449.75 for Dr. Huval's deposition.
The trial court signed a judgment in accordance with these reasons on January 31, 1996. Defendants appeal, asserting that the trial court erred in finding the plaintiffs and their doctors credible, in awarding excessive damages, and in assessing excessive court costs to the defendants.
For the following reasons, we conclude that the trial court manifestly erred in crediting the internally inconsistent and implausible testimony of the plaintiffs and their physicians. Additionally, the trial court abused its discretion in awarding damages to the seven claimants because they failed to prove, by a preponderance of the evidence, that their alleged injuries were caused by the accident. This finding of causation, based primarily on the medical testimony of Drs. Reyes and Huval, was manifestly erroneous in light of a lack of corroborating objective evidence and the clearly dubious nature of the medical and factual testimony.

FACTS
We shall first review the May 17, 1993 Lourdes medical records and the depositions of Dr. Reyes and Dr. Huval as they apply to each particular claimant. Thereafter, we will summarize the substance of the testimony taken at trial.

Dorothy Davis
Davis was examined by Dr. Robert S. Adi in the Lourdes emergency room. At the time, she was thirty-five years old. She complained that she had bumped her right thigh against the steering wheel, jammed her right hand, and sprained her neck in the accident. On examination, her neck and hand range of motion were normal. Dr. Adi noted slight tenderness on hand grip of the third extensor tendon, and a three by three centimeter bruise on the right thigh. He diagnosed a right thigh contusion, sprained neck, and sprained right hand. He prescribed 800 mg. of Motrin (Ibuprofen) three times per day. The Lourdes visit cost $78.00.
On direct examination, Dr. Reyes testified that Dr. Huval first examined Davis at the Trauma Clinic on May 20, 1993. Davis complained of back, head, neck, and jaw pain, but she did not mention her jammed right hand. Dr. Huval found Davis' neck range of motion to be normal with no tenderness and noted a two by two centimeter thigh bruise. Dr. Huval diagnosed a cervical spine sprain, a lumbosacral spine sprain, cephalalgia (headaches) and a left thigh bruise. Notably, the bruise was on the opposite leg from the bruise found two days earlier at Lourdes. She put Davis on full disability status and prescribed Restoril (a sleep medication) and Fiorinal (a pain reliever). She also recommended x-rays and physical therapy. Davis *914 was seen for a follow-up visit on May 27, 1993. Dr. William Huval, Dr. Huval's husband, advised her to continue the originally prescribed treatment plan. Dr. Reyes examined Davis on August 26, 1993. This was Davis' final visit to the Trauma Clinic. She complained of low back pain and, for the first time, left shoulder pain. Dr. Reyes prescribed Maclomen (an anti-inflammatory), Fiorinal, and Restoril; he instructed Davis to return in two weeks. She did not do so. Dr. Reyes concluded that Davis' symptoms and diagnosis were caused by the accident. The Trauma Clinic charged Davis $560.00 for her three visits.
On cross-examination, Dr. Reyes conceded that Davis did not complain of shoulder pain until the August visit. He acknowledged that his August diagnosis was based solely on Davis' subjective pain complaints.
Dr. Huval reiterated what Dr. Reyes said about Davis in his deposition. She also related Davis' injuries to the accident. On cross-examination, Dr. Huval stated that the only objective evidence of injury was the left thigh bruise, which was not located on the leg that Davis claimed hit the steering wheel.

Doris Davis
Doris was nine years old when Dr. Adi examined her at Lourdes. Her physical exam was completely normal, with good range of motion with the exception of a minimal spasm in the neck muscle area and slight tenderness. Dr. Adi diagnosed a sprained neck and back and prescribed Pediaprofen (children's Ibuprofen). The Lourdes visit cost $78.00.
Dr. Reyes testified that Doris complained of head, back, and left shoulder pain. Dr. Huval found her to have normal range of motion on examination. She diagnosed cervical and lumbosacral strain and headaches. According to Dr. Reyes, Doris was deemed fully disabled. Doris was seen again on May 27 and August 26, 1993, with similar complaints. No x-rays or medications were prescribed. Dr. Reyes concluded that, assuming Doris' history was correct, her injuries were caused by the accident. The Trauma Clinic billed Davis $500.00 for services rendered to Doris. On cross-examination, Dr. Reyes testified that a "strain" is a diagnosis that is primarily based on the patient's complaints and history. He conceded that no diagnostic test can objectively show that a patient has a muscle strain.
Dr. Huval stated that, on examination of Doris, she noted that Doris walked with a painful gait. However, Dr. Huval noted no visible evidence of injury and full range of motion in the neck and back. Like her mother, Doris was seen on May 27, 1993, by Dr. William Huval and on August 26, 1993, by Dr. Reyes. Dr. Huval also related Doris' injuries to the accident. On cross-examination, she stated that, except for Doris' painful gait, her treatment and diagnosis were based solely on Doris' subjective pain complaints and her history.

Franchacka Davis
Franchacka was five years old when she was examined by Dr. Adi at Lourdes. According to his notes, Davis related that Franchacka began complaining of slight back pain and neck pain the night before. Dr. Adi noted that, on examination, Franchacka jumped off the bed without problem and touched her toes. Her back, neck, and shoulder range of motion was normal. Franchacka pointed to her mid-back as the site of her pain. Dr. Adi diagnosed "questionable sprained neck and back," and he prescribed Pediaprofen. Lourdes charged $78.00 for the visit.
Dr. Reyes testified that Franchacka complained to Dr. Huval of head, back, and neck pain. She diagnosed a cervical and lumbosacral sprain and headaches. Dr. Huval deemed Franchacka fully disabled. Dr. Reyes opined that Franchacka's injuries were causally related to the accident. Franchacka did not return after her initial examination. The Trauma Clinic charged $260.00 for her one examination. On cross-examination, Dr. Reyes stated that, at the time of the examination, the Trauma Clinic did not have possession of the Lourdes records. He conceded that, had they known that Franchacka and Doris jumped off the bed with ease and touched their toes, this factor would have significantly affected the Trauma Clinic diagnosis.
*915 Dr. Huval echoed the substance of Dr. Reyes' deposition insofar as Franchacka was concerned. On cross-examination, she related that her diagnosis was based solely on Franchacka's subjective complaints of pain.

Janet Tolliver
Tolliver was twenty-five years old when seen by Dr. Adi at Lourdes. Dr. Adi noted that she complained of a stiff neck and shoulder and back muscle pain. His examination detected minimal tenderness of her shoulder and neck muscles along with normal range of motion. Tolliver had difficulty extending and abducting her arms and could not bend and touch her toes. Dr. Adi diagnosed a sprained neck and back and prescribed Motrin (Ibuprofen) to be taken three times a day. Lourdes charged Tolliver $78.00 for the examination.
Dr. Reyes testified that Dr. Huval detected stiffness in Tolliver's neck and a somewhat restricted back range of motion. She diagnosed cervical and lumbosacral strain, a trapezius strain, and headaches and ordered x-rays. Tolliver was prescribed Maclomen, Fiorinal, and Restoril; she was deemed by Dr. Huval to be fully disabled. She returned for her final visit a week later on May 27, 1993. The Trauma Clinic charged $375.00 for its treatment of Tolliver. Dr. Reyes concluded that her injuries were causally related to the accident.
On cross-examination, Dr. Reyes stated that Tolliver's diagnosis was based on her complaints and her history of having been in an automobile accident. He explained, remarkably, that, "In this situation, I always render patients totally disabled on the basis of the fact that my diagnoses have not been completely established." Dr. Reyes stated further that the "fully disabled" status does not change until tests indicate otherwise or the patient tells him that satisfactory results have been achieved, i.e., that the patient feels better. He always lets his patients decide when they are ready to return to work.
Dr. Huval's testimony mirrored the substance of Dr. Reyes' testimony on Tolliver's condition. She also causally related Tolliver's condition to the accident. On cross-examination, she explained that the examination revealed no objective signs of injury, only subjective complaints.

Shamara Tolliver
Shamara was five years old when she was examined by Dr. Adi at Lourdes. She complained of back pain. However, Dr. Adi noted that she jumped from the stretcher and touched her toes without any problem and had painlessly normal range of motion. Despite this lack of findings, Dr. Adi diagnosed a sprained back and instructed her to take Tylenol as needed. Lourdes charged $78.00 for the examination.
Dr. Reyes stated that, at the Trauma Clinic, Shamara complained of head, neck, and back pain to Dr. Huval. On examination, she complained of a lumbosacral ache with motion, but had full lumbosacral range of motion. Shamara's neck region revealed some tenderness, but, again, she had full range of motion in this area. Dr. Huval diagnosed cervical and lumbosacral sprain with headaches and instructed her to take Tylenol as needed. Dr. Reyes related Shamara's condition to the accident. The charge was $315.00. On cross-examination, he conceded that the diagnosis was based solely on the patient's history.
Dr. Huval reiterated what Dr. Reyes said concerning Shamara. Dr. Huval also related Shamara's condition to the accident. She added that Shamara returned once on May 27, 1993, and was examined by Dr. William Huval.

Natasha Tolliver
Natasha was eight years old when seen by Dr. Adi at Lourdes. She denied any pain at any place in her body. Dr. Adi's notes indicate that, "[s]he however wants to be checked out because her mother brought her here." Dr. Adi's physical examination revealed excellent range of motion and no muscle tenderness. His diagnosis was "essentially healthy," and he released her with no restrictions and no medications. Lourdes charged $78.00 for the examination.
Dr. Reyes, on the other hand, testified that Natasha complained of right arm, head, and back pain on May 20, 1993. Dr. Huval examined Natasha on that day, and she *916 found Natasha to have normal range of motion and no stiffness or tenderness. Despite this lack of findings, Dr. Huval diagnosed Natasha with cervical and lumbosacral sprain and headaches. She did not prescribe any medication. Natasha was seen again at the Trauma Clinic by Dr. William Huval on May 27, 1993. Dr. Reyes causally related Natasha's diagnosis to the accident, and informed counsel that the Trauma Clinic charged $315.00 for the services rendered to Natasha.
On cross-examination, Dr. Reyes opined that approximately twenty percent of accident victims develop pain a week following an accident. When queried about whether he had reason to suspect the genuineness of Natasha's complaints, Dr. Reyes responded, "I'm not going to give you an opinion that is biased. I am a patient advocate. I will favor my patients because that's what I'm sworn to do .... there are patients that do not have problems until four (4) or five (5) days later."
Dr. Huval related that she found no visible evidence of injury on Natasha and that her examination was normal. She opined that causation vis-a-vis the accident was medically probable. On cross-examination, Dr. Huval conceded that her diagnosis was based solely on Natasha's subjective complaints of pain.

Jaron Tolliver
Jaron was three years old when he was examined at Lourdes by Dr. Adi, whose notes indicate that Jaron complained of pain in the back. On examination, Dr. Adi observed that Jaron "jumped up from the table, touched the toes, and range of motion at arm, neck and back are completely within normal limits. There is no palpatory tenderness noted." He also noted superficial abrasion marks on Jaron's lower legs. Despite the lack of objective findings involving Jaron's back, Dr. Adi diagnosed a sprained back and recommended that Jaron take Tylenol as needed for pain. Lourdes charged $78.00 for the emergency room examination.
Dr. Reyes testified that Dr. Huval examined Jaron on May 20, 1993. She noted a three centimeter by two centimeter right lower leg abrasion. Dr. Huval detected no knee swelling or redness and found Jaron's knee range of motion to be normal. Despite this, she diagnosed a knee sprain and right leg abrasion. Dr. Reyes stated that the Trauma Clinic charged $315.00 for examining Jaron.
Dr. Huval testified that, on examination, Jaron complained of right leg pain. She stated that her examination of Jaron yielded "normal" results and that she prescribed no medication.

Other Pertinent Portions of Reyes and Huval Depositions
Dr. Reyes testified that he was a general surgeon from 1956 to 1994. In January, 1994, Dr. Reyes "retired" from surgery. He is president of The Trauma Clinic, which has a main office in New Orleans and satellite offices in five other Louisiana cities. According to Dr. Reyes, seventy-five percent of the Trauma Clinic's patients are seen on referral from personal injury plaintiffs' attorneys. He stated that Dr. Huval, his daughter, was a Trauma Clinic employee. He opined that, although on occasion he has felt that some patients are malingering, he had no reason to doubt the veracity of the plaintiffs in this case. Dr. Reyes stated that he charged plaintiffs $700.00 for his time spent giving his deposition. He denied that his office had quoted the defendants' attorney a price of $2,000.00 or more for the taking of his deposition.
Dr. Reyes also acknowledged that the plaintiffs' attorney is a guarantor of their medical expenses. He also stated that he received a letter from plaintiffs' attorney which represented that a settlement of the litigation or a judgment is a condition precedent to payment to the Trauma Clinic. Dr. Reyes explained that Trauma Clinic patients must sign a personal responsibility statement concerning their medical expenses. He conceded that he usually abstains from pursuing patients personally for payment when their cases do not result in settlement or judgment. He acknowledged that he is more likely to get paid if his patients' litigation turns out financially favorable to them. In effect, given these circumstances, the Trauma Clinic's ability to collect on its fee is contingent on the patient/plaintiff's ability to *917 either effectuate a settlement of litigation or obtain a satisfactory judgment.
Dr. Huval testified that, at the time of her deposition, she was working in the emergency room at Good Samaritan Hospital in West Palm Beach, Florida. She explained that she worked in the Trauma Clinic four days per month, at the same time she worked in the Florida hospital, from May 1991 to August 1993. At the Trauma Clinic, she would routinely examine approximately 100 patients per day. We note that, even if she spent twelve hours in a day examining patients, her caseload equated to seven and two-tenths minutes of time spent per patient examination. According to Dr. Huval, approximately ninety percent of her patients were involved in litigation.
Dr. Huval initially explained that she considers all of her patients to be sincere in their complaints. She did agree that it was unusual to have all seven occupants of a car, which was involved in a minor accident, injured and in need of repeated medical attention. When informed later in her deposition by defense counsel of Davis' attempt to recover pre-accident property damage from Colonial Insurance on a car which Davis did not own, Dr. Huval stated that such actions gave her suspicion as to the claimants' veracity. After being informed of other inconsistencies in the plaintiffs' injury claims, Dr. Huval stated that she would find it very difficult to trust the plaintiffs' subjective pain complaints and to causally relate their diagnoses to the accident. She thereby recanted her opinion that the accident caused the plaintiffs' alleged injuries.

Trial Testimony and Evidence
At trial, plaintiffs' counsel announced that Davis was withdrawing her property damage claim and that he never represented the actual owner of the vehicle, Darrell Davis.
Davis testified that, at the time of the accident, her brother, Darrell, owned the Topaz she was driving. The car was available for her use whenever she needed it. Davis stated that she was in the process of buying the car, but that the sale had never been completed.
Davis stated that she and Tolliver were wearing seat belts at the time of the accident. Of the five children sitting in the back seat, only Jaron was not restrained by a seat belt. Jaron sat in the middle of the four girls. Davis said that, when Sonnier's car impacted her car's bumper, her body moved forward then back, the left side of her face hit the driver door window, and her right upper thigh hit the steering wheel. She testified that she experienced no significant pain immediately following the accident, and she told Officer Lewis that no one in the car was injured. According to Davis, both of her children, who were sitting on opposite sides of the rear seat nearest the doors, hit their heads against the left door window and the right door window, respectively, as a result of the car being impacted squarely on the front end.
Davis admitted that she was familiar with the car's damaged right fender and front hood area, which existed at the time her brother purchased the car. She acknowledged that the only visible damage caused by the accident was to the middle front bumper region; the impact caused the license plate holder to fall off the bumper. Additionally, she conceded that the accident did not damage the car's headlights, as she had claimed in her deposition. However, she also maintained that the impact damaged the tie rod. Davis stated that a week or two following the accident, she noticed a "knock in the wheel, in the hub, and within the part of the transmission which is the tie rod that fits into the transmission." She "parked" the car at that point and has not used it since. She contended that the car is inoperable as a result of the accident.
Janet Tolliver testified that the force of impact was mild. She explained that her body jerked forward then back against the passenger seat. On being jerked forward, she said that her head hit the dashboard. Tolliver testified that she experienced no pain at the accident site, but that her back, shoulder, and neck pain began to develop within twenty-four hours. She said that her injuries bothered her for three months following the accident. The injuries to her *918 children lasted two and one-half to three months.
On cross-examination, Tolliver stated that Natasha cut her forehead and was bleeding as a result of the accident. However, she did not tell this to Sergeant Lewis, the Lourdes physician, or the Trauma Clinic physician. She also stated that Jaron scratched his leg when he was thrown forward onto the center console; she could not explain why Doris recalled no one from the back seat being thrown onto the center console.
Sergeant Lewis testified that, at an accident scene, his number one priority is to check for injuries. He stated that he did so in a thorough manner. In this case, all of the plaintiffs denied being injured. He characterized the damage to the Davis vehicle as a "light" bumper scratch. Sergeant Lewis cited Sonnier for improper backing, a violation of La.R.S. 32:281.
Frank Saboe, a private investigator hired by Colonial Insurance, testified that he went to Davis' home to inspect the Mercury Topaz. According to Saboe, Davis told him that all of the damage on the car was caused by the accident. She said nothing to him about any of the damage preexisting the accident.

LAW AND OPINION
In his reasons for judgment, the trial judge succinctly concluded that the plaintiffs sustained minor injuries in the accident. He then awarded the damages to each plaintiff as enumerated above. Defendants contend on appeal that the trial judge erred in crediting the testimony of the plaintiffs and their physicians and in awarding damages which they characterize as excessive. Plaintiffs counter that this is essentially a case involving factual determinations which cannot be disturbed absent manifest error. Plaintiffs argue that the trial court's findings are not clearly wrong. They also maintain that the awards did not constitute an abuse of discretion.
The issues presented for our review are: (1) whether the trial court manifestly erred in determining that plaintiffs' alleged injuries were caused by the accident, and (2) whether the trial court abused its discretion in awarding damages. These issues are somewhat intertwined because the ability of the trial court in this case to award damages, the second issue, is dependent upon a positive finding of causation, the first issue.

Causation
A trial court's finding that a claimant's injuries were caused by a particular accident or event is factual in nature and will not be disturbed on appeal unless it is manifestly erroneous or clearly wrong. Stobart v. State, DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). As an appellate court, we may not substitute our judgment for that of the trier of fact, even if we believe that our evaluations and inferences are more reasonable. If the record, when read in its entirety, supports the fact-finder's conclusions and those conclusions are reasonable, an appellate court cannot reverse or modify the trial court's judgment which is based on those factual conclusions. An appellate court can only reverse a fact-finder's determinations when (1) it finds from the record that a reasonable factual basis does not exist for the findings of the trial court; and (2) it further determines that the record establishes that the findings are manifestly erroneous. Stobart, 617 So.2d 880.
In the present case, the trial judge's finding of causation was based primarily on his implicit decision to credit the testimony of Davis, Tolliver, Dr. Reyes and Dr. Huval. In other words, the trial judge believed these witnesses. Such credibility determinations should not be disturbed unless "documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story." Stobart, 617 So.2d at 882, citing Rosell, 549 So.2d at 844-45. If either of these exceptions to the general rule are present, a court of appeal may find manifest error even in a finding based on a credibility determination.
The finder of fact should assess the credibility of both expert and lay witnesses to determine the most credible evidence. The fact-finder need not accept all of the *919 testimony of any witness as true, and may accept or believe as true only a part or parts of a witness' testimony. Holmes v. Southeastern Fidelity Ins. Co., 422 So.2d 1200 (La.App. 1 Cir.1982), writ denied, 429 So.2d 133 (La.1983).
In Rogers v. Roch, 95-242, p. 16 (La.App. 5 Cir. 10/18/95), 663 So.2d 811, 817-818, writ denied, 95-2769 (La.1/26/96), 666 So.2d 678, the court stated:
Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based, as well as the professional qualifications and experience of the expert. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229; Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711, 719 (La.App. 2 Cir.1991). For an expert opinion to be valid and to merit much weight, the facts on which it is based must be substantiated by the record. Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315 (La.App. 4 Cir.1993); Russ v. Jones, 580 So.2d 1098 (La.App. 4 Cir. 1991). If the opinion is based upon facts not supported by the record, the opinion may be rejected. Meany, supra.

The trial court is not bound to accept the testimony of a physician, even in the absence of contradictory medical expert testimony. Russ, 580 So.2d 1098.
After carefully reviewing the entire record, which is summarized above, we conclude that the trial court erred in crediting the testimony of Dr. Reyes and Dr. Huval because the subjective facts upon which their diagnoses and opinions were based are not substantiated by the record. Additionally, Dr. Huval changed her opinion on causation when informed of the inconsistent nature of plaintiffs' complaints and Davis' attempt to collect property damage proceeds on a car which she did not own.
The symptoms detected were minimal, and the diagnoses were uniformly based upon subjective complaints of pain. Additionally, even though Dr. Adi did detect some positive symptomatology in some of the plaintiffs, his examination notes and summaries which are in the record express no medical opinion as to whether the accident caused the patients' symptoms.
The numerous substantially contradictory statements of Davis and Tolliver, including Davis' blatant attempt to file a property damage claim on a car which she did not own, served only to erode the tenuous credibility of their medical complaints. A claimant's lack of credibility on factual issues can serve to diminish the veracity of her complaints to a physician. See Freeman v. Rew, 557 So.2d 748 (La.App. 2 Cir.), writ denied, 563 So.2d 1154 (La.1990). It is clear that Davis' and Tolliver's version of the event and their symptoms are implausible and, at the same time, internally inconsistent and inconsistent with each other in many respects.
Dr. Reyes' testimony concerning the Trauma Clinic's method of determining a patient's disability status is particularly unsettling. His novel view that all of his patients are "fully disabled," even in the absence of any objective symptoms, until proven otherwise by diagnostic tests or the patient's self-professed improvement, is both medically and factually unrealistic. Dr. Reyes' testimony is not believable.
We therefore conclude that the trial court erred in finding that the accident caused injury to the claimants. This situation presents the classic illustration of the Latin maxim, "Falsus in uno, falsus in omnibus." These claimants and their doctors were simply not credible.

Quantum
Because we find that the trial court erred in determining that the plaintiffs proved that their injuries were caused by the accident, we necessarily reverse the awards of general damages to the plaintiffs. We find that, because they were involved in an accident, albeit minor, they were entitled to and justified in getting the medical evaluations at Lourdes after the accident. See Coleman v. United States Fire Ins. Co., 571 So.2d 213 (La.App. 3 Cir.1990). However, after the Lourdes examinations, they were not justified in seeking medical evaluations at the Trauma Clinic. Therefore, we reduce the medical expenses awarded on behalf of the plaintiffs to $78.00 each, the cost of their initial examination at Lourdes, which took place two days after the accident.
*920 In our view, the charges, incurred at the Trauma Clinic for routine yet abbreviated medical examinations and assessments, were exorbitant, given that no diagnostic tests were conducted on any of these plaintiffs. Such outrageously high fees serve only to raise the cost of casualty insurance for all of the automobile driving public, which, ironically, includes the very same doctors who charge these excessive fees for routine work. It is clear that this so-called "treatment" was sought solely for the purpose of litigation at the urging of the plaintiffs' lawyer.

Court Costs
On the issue of the trial court's assessment of all court costs to the defendants, we find that the trial court erred. It is well settled that a trial court has broad discretion in the assessment of court costs. However, we reverse this ruling due to our reversal of this case on the merits. It would be fundamentally unfair to strap the successful party with court costs. We reassess all trial court costs to the plaintiffs.

DECREE
For these reasons, we reverse the trial court's awards of general damages and reduce the special medical expense damages awarded to $78.00 per plaintiff. We also reverse the assessment of trial court costs to the defendants and decree that the plaintiffs shall pay all of the court costs incurred at the trial level.
Costs of this appeal are to be paid by plaintiffs-appellees.
REVERSED IN PART; AMENDED IN PART.