I! GASKINS, J.
In this medical malpractice action, the plaintiffs appeal from a jury verdict rejecting their claim that the defendant doctor’s negligence contributed to the, death of their elderly mother or caused her to lose a chance of survival. For the reasons assigned below, we affirm.
FACTS
At the time of her death, Ann V. Lovelace had been under the medical care of the defendant, Dr. William Giddens, for *653 approximately 17 years. On Tuesday, August 17,1993, Mrs. Lovelace — age 82 — was seen by Dr. Giddens for an annual exam. She was accompanied to her appointment by her niece. When Dr. Giddens was taking down her history, Mrs. Lovelace reported several symptoms of brief duration, including shortness of breath, weak knees, and a temperature of 101.5 the previous day. She told Dr. Giddens that she “felt bad” after going to the beauty shop the previous Friday but stated that she felt “better today.” They also discussed her various medications. The doctor conducted a general physical examination of Mrs. Lovelace. As part of her checkup, Mrs. Lovelace’s temperature was taken but not recorded.[1]
Dr. Giddens also ordered a chest x-ray, an EKG, and blood work. Most of these tests were conducted in-house, including the chest x-ray. Some of the blood work was sent to a reference laboratory in Dallas, Texas; the results of these tests were not available until the following day. At the conclusion of the office visit, Dr. Gid-dens sent Mrs. Lovelace home.
Prior to Mrs. Lovelace’s departure, Dr. Giddens did not review the test results that were then available. However, he intended to call her after he had | ¡.obtained and reviewed the results of all of her tests. As he was not scheduled to be in the office on the following day, the earliest he would have called her with the results was Thursday, August 19.
After leaving the doctor’s office, Mrs. Lovelace and her niece went for yogurt. Then, apparently not alarmed by her aunt’s appearance, her niece took Mrs. Lovelace home and left her alone.
The next day, Mrs. Lovelace was found in her home, confused and disoriented. She was seen in the emergency room of the Schumpert Medical Center by Dr. Paul Wilson, one of Dr. Giddens’ partners. Also that day, Dr. Samuel Lieber, another one of Dr. Giddens’ partners, examined the chest x-ray from Mrs. Lovelace’s annual exam and diagnosed severe bilateral pneumonia. Mrs. Lovelace was admitted to the medical center, where she remained until her death on August 23, 1993. The cause of death was listed by Dr. Giddens on her-death certifícate as: (1) respiratory failure and (2) “diffuse alvolar damage with organization [healing] and bronchiolitis obliter-ans, etiology unknown.”
Mrs. Lovelace’s two sons pursued claims of negligence against Dr. Giddens before a medical review panel which ruled in the doctor’s favor. Specifically, the panel found that Dr. Giddens’ conduct in connection with the office visit of August 17,1993, did not breach the applicable standard of care and that the conduct complained of was not a factor in causing her harm. In written reasons, the panel stated that, based upon Dr. Giddens’ notes, Mrs. Lovelace did not appear acutely ill and “[m]any physicians read routine chest X-rays at a later date in patients who do not appear acutely ill.” Thereafter, the present medical malpractice suit against Dr. Giddens was filed by Mrs. Lovelace’s sons.
| aPrior to trial, Dr. Giddens filed a motion in limine. ■ He sought to exclude or restrict the testimony of Dr. Carl Schoen-berger, a pulmonologist and critical care specialist who had recently been named as the plaintiffs’ expert witness and deposed by defense counsel. Dr. Giddens moved to exclude Dr. Schoenberger’s negative opinions pertaining to the care rendered to Mrs. Lovelace after her hospitalization by Dr. Giddens. The motion was granted in part and denied in part. The testimony of Dr. Schoenberger was not excluded; however, it was restricted. The trial court ruled that testimony would be excluded as to any breach of care by other doctors and any breaches committed after August 17, 1993; this restriction of testimony was ap *654 plied to all witnesses, not just Dr. Schoen-berger. The focus of trial testimony was confined to the office visit of August 17 only. Dr. Giddens objected to the trial court’s ruling.
Jury trial was held in July 1997. Although the jury found that Dr. Giddens had failed to meet the standard of care required of him in his treatment of Mrs. Lovelace on August 17, 1993, it also found that the plaintiffs failed to prove by a preponderance of evidence that his medical malpractice was the cause or a substantial factor in either bringing about Mrs. Lovelace’s death or causing her a lost chance of survival. Consequently, judgment was rendered by the trial court rejecting the plaintiffs’ demands at plaintiffs’ cost.
LOSS OF CHANCE OF SURVIVAL
The plaintiffs appeal the jury’s determination that Dr. Giddens’ negligence did not contribute to the death of their mother or cause a lost chance of survival.

Law

Against a medical malpractice defendant, the “lost chance of survival” concept permits recovery of damages resulting from a medical provider’s failure to alter the course of a pre-existing condition by providing adequate care or | ¿treatment. See, e.g., Smith v. State, Department of Health and Hospitals, 95-0038 (La.6/25/96), 676 So.2d 543; Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). And, while recognizing that there may be more than one cause-in-fact of a death, a plaintiff claiming that the deceased lost a chance of survival must establish that the defendant’s negligence substantially contributed to the patient’s demise, i.e., lessened the chance of survival. Hastings, supra; Rowsey v. Jones, 26,823 (La.App.2d Cir.5/10/95), 655 So.2d 560; Clark v. City of Shreveport, 31,407 & 31,649 (La.App.2d Cir.1/20/99), 726 So.2d 1042. Said differently, there must be a causal connection between the death and the alleged acts of professional negligence, and the plaintiff must prove that the deceased had a chance of survival, prior to the complained-of act, which was then lost as a result of that negligence. Smith, supra; Rowsey, supra; Clark, supra.
The issue of causation in medical malpractice cases is subject to the manifest error standard of review. Hoot v. Woman’s Hospital Foundation, 96-1136 (La. App. 1st Cir.3/27/97), 691 So.2d 786, writ denied, 97-1651 (La.10/3/97), 701 So.2d 209. In a medical malpractice case, the reviewing court must give great deference to the jury’s findings when medical experts express different views, judgments, and opinions on whether the breach of the standard of care caused plaintiffs damages. Such expert opinions are necessary sources of proof whose views are persuasive, although not controlling, and any weight assigned to their testimony by the jury is dependent upon the expert’s qualifications and experience. Davis v. Sonnier, 96-515 (La.App. 3rd Cir.11/6/96), 682 So.2d 910; Hoot, supra.
Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof, are factual issues to be resolved by the trier of fact and will not be disturbed |Bon appeal in the absence of manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991).
If the record, when read in its entirety, supports the fact-finder’s conclusions and those conclusions are reasonable, an appellate court cannot reverse or modify the trial court’s judgment which is based on those factual conclusions. An appellate court can only reverse a fact-finder’s determinations when: (1) it finds from the record that a reasonable factual basis does not exist for the findings of the trial court, and (2) it further determines that the record establishes that the findings are manifestly erroneous. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).

*655
Testimony

Dr. Schoenberger, the plaintiffs expert, testified that Dr. Giddens’ negligence caused or contributed to Mrs.. Lovelace’s death. On cross-examination, however, he stated he could not give an opinion on the harm caused by the 20- to 24-hour delay in hospitalization. .
The three members of the medical review panel — Dr. Maureen Kaough, Dr. Richard Haynie and Dr. Roan Flenniken— all testified as defense expert witnesses qualified in internal medicine.
Dr. Kaough was asked if the one-day delay would have made a difference in the final outcome. She responded, “I think that’s very unknown, because nobody knows what the etiology is of her condition,” and, further answering, Dr. Kaough said it would be impossible to say.
Dr. Haynie was also questioned as to whether the one-day delay in hospitalization made a difference. He testified, “I can’t answer that, but I think the odds were against her from the very beginning. But I can’t give you any sure [ ^answer on that.... In my opinion more likely this disease was already progressed to the point she wasn’t going to get over it when she presented to Dr. Giddens.” He also stated, “I think it’s more likely that she wouldn’t have survived it. I can’t tell you for sure what would have happened.” On cross-examination, he maintained, “Knowing everything we know now in retrospect it’s likely [immediate hospitalization] wouldn’t have made a bit of difference. But it may have, I can’t tell you.”
Dr. Flenniken offered the following opinion:
It’s hard for me to tell you the exact percentages that she would have had of living and walking out of that hospital if she had been hospitalized the moment he saw her versus twenty four hours later. I think the difference is small. There is, as far as this illness is concerned, a chance she would have made it. That chance would have been in my opinion small. I can’t give you an exact percentage. I think the chances of her having a meaningful quality life because ■ this is a chronic progressive illness [that] there is not good treatment in my opinion for it at all. The chances of her having a reasonable quality of life and living six months are in my opinion zero. The chances of her walking out of that hospital were very low.... I can’t say for sure. I think the chances are low, I can’t give you a percentage. I would think the chances were low no matter what was done. The chances of a six month or three month survival are much lower than that....
Dr. Lieber, Dr. Giddens’ partner and an expert witness qualified in the field of internal medicine, also testified that he did not think that Mrs. Lovelace would have survived even if hospitalized on August 17, 1993. If she had been hospitalized then, her chances of survival might “possibly but' highly unlikely” been increased. He further stated, upon questioning:
Q. We know that the lung problem existed before this x-ray was taken on August 17th, 1993, don’t we?
A. Apparently proven to be by the pathologist seven to fourteen days.
Q. From the biopsy?
|7A. From" the biopsy, which was three or days [sic] after this x-ray.
Q. Just looking at this x-ray there is no way for you to tell us how long that existed?
A. No, sir. This person could have . chronic lung disease for twenty years. It [is] unlikely but it could happen. All we can say is that something did happen between those two [x-rays[2]]. I’m not trying to say it happened six months earlier. We don’t know and there is no way for us to know. ...
*656 Q. Doctor, you’ve looked at these x-ray studies, this x-ray study and the hospital study, and more likely than not Mrs. Lovelace was not going to survive this illness even if she had been hospitalized on the 17th, isn’t that right?
A. Well, we know that statistically these people don’t survive. If you take subsets in that universe then if a person has had a terrible accident, maybe a few will survive. If [a] person is aged maybe they will survive. I’ll have to leave the statistics to the pulmonologist. Let me tell you your chances are going to [be] fifty-fifty. She had a possibility of survival of fifty percent and possibility of death of fifty percent. It’s either going to happen or not. But in this type of disorder most [of] these people are not able to be helped, they die.
Q. And the fifty-fifty that’s you and me standing here today?
A. Either I’m going to drop dead or not, nobody knows. I’m not [minimizing] the possibilities, but it’s a just bad deal, [sic] Apparently with this diagnosis nothing would have prolonged her life.
Q. Dr. Lieber, in your opinion what caused Mrs. Lovelace to die?
A. Mrs. Lovelace had terrible complications after she was hospitalized. She had trouble with breathing and was placed [on] positive pressure 'breathing. She developed in all likelihood heart failure, she started having hemorrhagic disorders within the blood vessels, she had some kidney failure. So she had multi organ failure about which probably nothing could be done. |sThe basic problem was that she couldn’t exchange oxygen in her lungs between the air and the blood in her lungs because of this pathological disorder, this disease state. If you can’t exchange oxygen it’s like [you] don’t have lungs, if you don’t have lungs you’re going to die in a minute or two.
Dr. Lloyd Whitley, a defense expert in pulmonary medicine and critical care medicine, testified that had Mrs. Lovelace been hospitalized immediately, he still did not believe that she would have survived her illness. He stated: “I would think [her chances of survival] would be very low.... I don’t think she is going to survive. We have got to treat her and see what we can do.” He testified that he would have informed her family that he did not think she would survive.

Discussion

After hearing the testimony of all of the medical experts, the jury concluded that Dr. Giddens’ negligence was not a substantial factor in causing Mrs. Lovelace to die or lose a chance of survival. After a careful review of the medical evidence, we find that the jury did not commit manifest error in so finding.
None of the doctors were willing to assess percentages as to Mrs. Lovelace’s chances of survival. Of the doctors specializing in internal medicine, Dr. Kaough refused to give an opinion as to the effect of the brief delay in hospitalization. Dr. Haynie was reluctant to offer an opinion on the subject; however, his inclination was that immediate hospitalization would not have made a difference. Dr. Flenniken also felt unable to assign any percentages with any accuracy. Although he testified that there was a chance she might have survived, he could only characterize it as “small” or “very low”; he was even less optimistic about her ability to survive for the next three to six months. The essence of Dr. Lieber’s testimony was that even with hospitalization on August 17, 1993, nothing would have prolonged Mrs. Lovelace’s life. Dr. Schoenberger, who specializes in | apulmonary and critical care medicine, was impeached with his two-week-old deposition testimony that he could not give an opinion on the effect of the delay in *657 hospitalization. However, Dr. Whitley, also an expert in pulmonary and critical care medicine, testified that, while it was appropriate to attempt treatment, he did not believe she would survive her illness.
The jury had evidence upon which they could reasonably find that Dr. Giddens’ failure to hospitalize Mrs. Lovelace on the day of her annual exam neither caused her death nor deprived her of a chance of survival. Dr. Lieber and Dr. Whitley both indicated strongly in their testimony that Mrs. Lovelace would have died no matter what was done, including immediate hospitalization. Consequently, the jury did not commit manifest error.
CONCLUSION
The trial court judgment against the plaintiffs and in favor of the defendant is affirmed. Costs are assessed against the plaintiffs.
AFFIRMED.
BROWN, J., dissents with reasons,

. Although the plaintiffs assert that Mrs. Lovelace’s temperature was not taken, Mrs. Lovelace’s niece, who was present at the exam, testified that it was. However, review of the medical records demonstrates that the temperature reading was not written down.

. During his testimony, Dr. Lieber compared Mrs. Lovelace’s x-ray on August 17, 1993 with one taken in January 1993, at which time she apparently had no complaints.