BROWN, Chief Judge.
| ;On July 15, 2002, Carolyn Coody and her husband, Orville Coody, filed a medical malpractice action against Dr. J. Michael Barraza, Radiology Associates and St. Paul Fire and Marine Insurance Company.[1] Thereafter, on May 29, 2003, at the age of 69 years, Carolyn Coody died of *488 ovarian cancer. In an amended petition, Carolyn’s husband and three children, Katherine Coody Manning, David Coody and Rodger Coody, were substituted as plaintiffs.[2] Defendants and intervenor, Louisiana Patient’s Compensation Fund, appeal from the judgment entered in accordance with the jury’s verdict finding that Dr. Barraza breached the standard of care of a diagnostic radiologist and awarding a lump sum to plaintiffs of $250,000 in damages. For the reasons stated herein, we affirm.

Facts and Procedural Background

Germane to this case, Carolyn Coody’s ovarian cancer was found in 1994 by Dr. Ralph Armstrong, an OB/GYN. Thereafter, Dr. Marshall Leary, a Monroe oncologist, along with Dr. J. Taylor Wharton, the head of the Gynecologic Oncology Department at M.D. Anderson Hospital in Houston, Texas, administered several courses of chemotherapy. In July 1995, Mrs. Coody’s cancer went into remission.
Statistically, ovarian cancer has a high risk of recurrence. Thus, Mrs. Coody was monitored on a regular basis by Dr. Leary in Monroe. He |?checked her CA-125 level, which is a tumor marker, with regular blood samples. In. March 1999, Mrs. Coody’s CA-125 level had risen and was abnormal. Dr. Leary promptly referred her for a CT scan. On April 1, 1999, Carolyn Coody underwent a CT scan of her abdomen and pelvis at North Monroe Hospital. Dr. J. Michael Barraza, a diagnostic radiologist, interpreted the study and found that the scan showed no evidence of active disease and reported no pelvic adenopathy, which is an abnormal or enlarged lymph node.
Over the next seven months, Dr. Leary continued to monitor Mrs. Coody and investigate the cause of her continually rising CA-125 level. Dr. Leary coordinated with Dr. Wharton. Dr. Leary ordered another CT scan. On November 4, 1999, the scan was performed at Glenwood Hospital and interpreted by Dr. Henry Hollen-berg, a diagnostic radiologist. Dr. Hollen-berg noted an oval soft tissue density measuring 1.5 cm x 2 cm just anterior to the right iliac artery, which he thought represented a metastatic enlarged lymph node. Dr. Hollenberg then reviewed Mrs. Coody’s April CT scan and confirmed that the soft tissue density was present on that CT scan as well. Dr. Hollenberg noted that the questionable lymph node in the April CT scan appeared slightly greater in size than on his current exam.
Dr. Leary sent the November CT scan to Dr. Wharton and obtained the first available appointment (December 17,1999) for Mrs. Coody at M.D. Anderson. It was at this visit that Mrs. Coody was first informed about the abnormal results of her November CT scan and that those abnormalities were visible on the April CT scan as well. On January 13,132000, Dr. Wharton removed the 2.5 cm x 2.5 cm cancerous lymph node, and, thereafter, Mrs. Coody began chemotherapy. She received chemotherapy from February 2000 through November 2002. Mrs. Coody died as a result of her ovarian cancer on May 29, 2003. She was survived by her husband of 47 years, Orville Coody, and her three major children, Katherine Coody Manning, David Coody, and Rodger Coody.
On November 1, 2000, the Coodys submitted their claim for malpractice to a medical review panel. The panel found *489 that, although Dr. Barraza was aware that Mrs. Coody had previously been diagnosed with ovarian cancer, his conduct met the accepted standard of care for a radiologist. In particular, the medical review panel incorrectly stated:
We have looked at this film in great detail and we have concluded that the interpretations of the CT scans of the abdomen and the pelvis by Dr. Barraza certainly met the accepted standard of care for a radiologist. We agree with the opinion of Dr. Folse, the radiology expert offered by Dr. Barraza, that the images in # 53 and # 54 of the North Monroe Hospital film (April 1999) and images # 7 and # 35 of the Glenwood Regional Medical Center film (November 1999) show a section of small bowel (probably a non-opacified portion of bowel loop) and not an enlarged and/or cancerous lymph node.
The medical review panel issued its opinion on April 16, 2002.
On July 15, 2002, the Coodys filed the instant suit seeking damages arising from Dr. Barraza’s failure to properly interpret Mrs. Coody’s April 1999 CT scan. A jury trial on the matter was commenced on March 12, 2012. After a six-day trial, the jury found in favor of plaintiffs and awarded them lump sum damages in the amount of $250,000. Dr. Barraza, Radiology Associates, and St. Paul Fire and Marine Insurance Company |4were ordered to pay $100,000, and the Louisiana Patient’s Compensation Fund was ordered to pay the remaining $150,000.

Discussion

Breach of the Standard of Care

The claim that a defendant caused the decedent’s death is not the same as the claim that the defendant caused her a loss of a chance to survive. The two theories of injury are distinct. They entail different damage calculations. Where the evidence could support either a theory that the defendant’s conduct caused the decedent’s death (making full wrongful death damages appropriate) or a theory that the defendant’s conduct caused the decedent a loss of a chance of survival, Louisiana law is clear that only one kind of damages or the other may be awarded. A jury may find the defendant liable either for causing the patient’s wrongful death or for causing the patient’s loss of a chance to survive, but not for both. Smith v. State, 95-0038 (La.06/25/96), 676 So.2d 543.
In Lovelace v. Giddens, 31,493 (La. App.2d Cir.02/24/99), 740 So.2d 652, 658-59, twit denied, 99-2660 (La.11/24/99), 750 So.2d 987, on rehearing, this court said:
Obviously, Mrs. Lovelace had a pre-ex-isting illness not caused by Dr. Giddens; however, a physician’s failure or delay in diagnosing a serious illness could in some circumstances diminish or destroy the patient’s opportunity or chance for a cure or recovery. A wrongful death claim requires proof by a preponderance of the evidence, or more than fifty percent, that the doctor’s malpractice caused the patient’s death. Many patients, however, live when their chances were initially believed to be less than even. The harshness of this traditional standard of proof has been recognized as unfair when medical fault takes away an opportunity to survive. The doctrine of a lost chance of survival takes into account this real consequence |sof physician fault and seeks to protect the possibility for a favorable outcome, even where the patient’s chances of recovery were initially believed to be less than fifty percent.
In Smith, supra, the supreme court recognized the right to recover damages for any lost chance of survival and set forth the method of valuation. In Smith, X-rays *490 showed a fast-acting cancer. The patient was released without being told of the findings. When the patient returned the following year, it was too late. The hospital admitted negligence but said that the patient would have died anyway. The Smith court found that a tort-caused lost chance of survival of any degree is “a distinct compensable injury ... to be distinguished from the loss of life in wrongful death cases.” Smith, 676 So.2d at 547.
In Smith, supra, the supreme court set forth the prerequisites to prove the loss of a less-than-fifty percent chance of survival. Plaintiff must show by a preponderance that: (1) the victim had a chance to survive at the time of the professional negligence; (2) the tortfeasor’s action or inaction deprived the victim of all or part of that chance; and, (3) the value of that lost chance. See also Lovelace v. Giddens, supra.
The manifest error standard of review applies to review of medical malpractice claims. Jackson v. Tulane Medical Center Hosp. and Clinic, 05-1594 (La.10/17/06), 942 So.2d 509. A court of appeal may not set aside a trial court’s or jury’s finding of fact in the absence of manifest error or unless clearly wrong. Hays v. Christus Schumpert Northern Louisiana d/b/a Christus Schumpert Health Sys., 46,408 (La.App.2d Cir.09/21/11), 72 So.3d 955. In order to reverse a fact finder’s determination, an appellate | r,court must review the record in its entirety and find that a reasonable factual basis does not exist for the finding and further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Benefield v. Sibley, 43,317 (La.App.2d Cir.07/09/08), 988 So.2d 279, units denied, 08-2162, 08-2210 (La.11/21/08), 996 So.2d 1107, 08-2247 (La.11/21/08), 996 So.2d 1108.
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Hays, supra. Where there are contradictory expert opinions regarding compliance with the applicable standard of care, .the appellate court is bound to give great deference to the conclusions of the trier of fact. Id.
In order to recover damages in their medical malpractice action, plaintiffs had to establish the standard of care applicable to a diagnostic radiologist and prove, by a preponderance of the evidence, that Dr. Barraza breached that standard of care, and, further, that his breach caused Mrs. Coody a loss of a chance of a better medical outcome or longer survival. Defendants contend that the jury was manifestly erroneous in its finding that plaintiffs met their burden in proving both breach and causation.
During the trial the jury heard the testimony of five diagnostic radiologists regarding the applicable standard of care, and each gave his expert opinion as to whether Dr. Barraza breached that standard of care when he failed to identify and report the 1.5 cm x 2 cm soft tissue density on Mrs. Goody’s April 1999 CT scan. Four of the doctors, including Dr. |7Barraza, testified that there was no breach. One doctor, plaintiffs’ expert, Dr. Malcolm Friedman, testified that Dr. Bar-raza deviated from the accepted standard of care.
Dr. Friedman testified that he was contacted by plaintiffs’ counsel. Prior to receiving any information about the case, Dr. Friedman requested the attorney to send him the April CT films so that he could perform a cold read. Dr. Friedman noted the soft tissue density anterior to the right iliac artery, and called plaintiffs’ counsel to inform him of his findings. Dr. Friedman *491 was then sent all other relevant medical records, including the November CT films.
Dr. Friedman testified that the applicable standard of care requires a radiologist to report a soft tissue density with dimensions measuring in excess of 1 cm at its short axis. Dr. Friedman stated that he measured the soft tissue density on the April CT scan at approximately 1.8 cm x 2 cm. Additionally, Dr. Friedman testified that due to Mrs. Coody’s known previous diagnosis of ovarian cancer and the fact that she was being referred for a CT scan by her oncologist, he believed that there was a heightened expectation for Dr. Bar-raza to carefully examine the CT scan to pay extra attention to areas where cancer is likely to recur, such as the lymph nodes and solid organs. Dr. Friedman concluded that Dr. Barraza breached the standard of care for a diagnostic radiologist by failing to properly interpret the April CT scan and report the presence of the soft tissue density to Dr. Leary.
|SAI1 of the other radiologists testified in support of Dr. Barraza. All except Dr. Barraza stated that the standard of care requires the reporting of a soft tissue density measuring in excess of 1 cm (Dr. Hollenberg said his usual requirement is 1.5 cm). Dr. Barraza, however, testified that there were no mandatory reporting requirements, but he usually reports anything measuring 1.5 cm. In fact, Dr. Bar-raza testified that he missed the soft tissue density at issue on his initial read, but had he seen it he would have reported it to Dr. Leary. All of the radiologists testified at the trial that a soft tissue density measuring approximately 1.5 cm x 2 cm anterior to the right iliac artery was present on the April CT scan, and that it was in fact the pelvic adenopathy that was removed by Dr. Wharton at M.D. Anderson in January 2000, which contradicts the medical review panel’s conclusion. Nonetheless, Drs. Hol-lenberg, Barraza, Folse, and Bos maintained that Dr. Barraza did not breach the accepted standard of care when he interpreted the CT scan on April 1,1999.
Regardless of the fact that more radiologists testified in support of Dr. Barraza, we do not find that the jury’s reliance on the testimony of Dr. Friedman to be manifestly erroneous. The jury, as the trier of fact, is afforded great deference when presented with contradictory expert opinions. The jury was in the better position to make credibility determinations.
Considering the size of the soft tissue density, Dr. Barraza’s knowledge of Mrs. Coody’s previous ovarian cancer diagnosis, and his failure to identify and report the pelvic adenopathy to Mrs. Coody’s treating oncologist, we find that there was a reasonable factual basis for the jury to [^determine that Dr. Barraza breached the accepted standard of care for a diagnostic radiologist.

Loss of a Chance

Defendants argue that even if Dr. Barraza breached the standard of care, the jury’s finding that the seven-month delay in diagnosis caused Mrs. Coody a loss of a chance of a better medical outcome or longer survival was manifestly erroneous. Specifically, defendants, in their appellate brief, state:
None of the testimony established that Ms. Coody’s treatment would have been any different had her recurrent ovarian cancer been diagnosed in April 1999 or that, more probably than not, she lost a chance of being in the ten percent of ovarian cancer patients who her treating physician was able to get into a second remission.
While defendants’ statement is correct, they fail to apply the correct legal principle. The law governing the loss of a chance of a better outcome does not re *492 quire plaintiffs to offer proof of lost treatment options or that more probably than not Mrs. Coody would have been in the ten percent of patients with a recurrence of ovarian cancer that are able to achieve a second remission. Instead, as stated in Smith, supra, the issue in loss of a chance cases is whether the tort victim lost any chance due to a defendant’s negligence.
Dr. Wharton, who at the time of treating Mrs. Coody was chairman of the gynecologic oncology department at M.D. Anderson, testified that, based on his 38 years of experience, approximately ten percent of recurrent ovarian cancer patients are able to go into a second remission. Dr. Wharton stated that in these instances, patients had been able to live an extra five or | ,nsix years without symptoms or in need of treatment. Regarding Mrs. Goody’s chance of achieving a second remission if she had been able to begin her treatment seven months earlier, Dr. Wharton and counsel for plaintiff had this exchange:
Q: Okay. Now, if in fact — and we— you told me rather candidly earlier that if in fact Mrs. Coody had come to you, you had known in April that this mass was here and would have been able to operate on it in June, before it got larger, as it did in January, and before there was any other radiographic evidence of tumor, as there was in November, that you would probably have had a better chance of putting it in remission. True?
A: That’s true.
Although Dr. Wharton and defendants’ expert gynecologic oncologist, Dr. Destín Black, both testified that Mrs. Coody would not have been cured of her cancer regardless of when the treatments commenced, curing the disease is not a requirement. Achieving a second remission would have been a better medical outcome. It could have prolonged Mrs. Coody’s life, if only briefly, and possibly have granted her a reprieve from the chemotherapy that was causing her and her family added pain and suffering.
Based on the testimony of Dr. Wharton, we find that the jury had a reasonable factual basis to determine that Dr. Barra-za’s breach caused Mrs. Coody a loss of a chance of a better outcome or longer survival.[3]
| ^Damages
In the determination of general damages, the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2824.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Reasonable persons frequently disagree about the measure of general damages; therefore, it is only when the award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Id.
In Smith, supra at 548-549, the supreme court stated:
The lost chance of survival in professional malpractice cases has a value in and of itself that is different from the value of a wrongful death or survival claim. (Footnote omitted).
... This is a valuation of the only damages at issue-the lost chance-which is based on all of the relevant evidence in *493 the record, as is done for any other measurement of general damages. Allowing the jury to consider all the evidence, including expert medical testimony regarding the percentage chances of survival, and to value directly the lost chance is more logical than requiring the jury to calculate damages for wrongful death when the physician’s negligence was not the more probable cause of the death.
The loss of any chance of survival is a distinct injury compensable as general damages which cannot be calculated with mathematical certainty. Smith, supra. The fact finder should make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss. Id. The jury is allowed to consider an abundance of evidence and factors, including 112evidence of percentages of chance of survival along with evidence such as loss of support and loss of love and affection, and any other evidence bearing on the value of the lost chance. Id. The jury’s verdict of a lump sum amount of damages can be tested on appeal for support in the record by reviewing the percentage chances and the losses incurred by the tort victim and his or her heirs, and any other relevant evidence, thus providing assurance against speculative verdicts. Id.
Mrs. Coody testified that once her ovarian cancer went into remission in 1995, she underwent regular blood tests to monitor her CA-125 level for the sole purpose of catching any recurrence at the earliest possible time. The reason for the early detection according to Mrs. Coody was to give her the best opportunity possible to achieve a second remission. She stated that she was very worried about her continually rising CA-125 level after her April CT scan supposedly came up clean. In December 1999, upon learning that her cancer was back and had been identifiable on the April CT scan, Mrs. Coody stated that she felt “devastated, sick, scared.” Mrs. Coody had lost faith in the doctors that she relied on for her care. Clearly, Mrs. Coody suffered a great deal of mental anguish from her hopeless condition and the knowledge that earlier detection was lost because her CT scan was not adequately read.
In addition to the mental anguish, Mrs. Coody suffered almost four years of deterioration. Three years of chemotherapy. Three years of nausea, fatigue, weakness, weight loss, hair loss, infections, bowel and kidney problems, hospitalizations, and surgeries. The testimony of the | ^Coodys— video testimony from Mrs. Coody herself and live testimony from her husband of 47 years and her three children — showed the mental anguish and emotional distress that the family also endured, as well as the love they had for one another. The Coodys testified that they were an extremely close-knit family. David, Rodger, and their respective families lived on and worked the family farm with Orville and Mrs. Coody. The Coodys assert that the battle Mrs. Coody waged in hopes of a brief period cancer-free is a testament to how much she valued her chance of achieving a second remission.
Reviewing the award of damages in the light most favorable to the plaintiffs, we do not find that the jury abused its vast discretion in awarding plaintiffs damages in the lump sum amount of $250,000.

Conclusion

For the reasons expressed above, the verdict of the jury is affirmed. Costs of this appeal are assessed to defendants.

. Dr. Marshall Leary was also named as a defendant but was dismissed with prejudice on September 19, 2006, following a favorable ruling on his motion for summary judgment.

. Specifically they filed the following claims: survival, wrongful death, and lost chance of survival or longer life, as well as their loss of consortium and society during the period preceding Carolyn Coody’s death.

. Based upon this finding we pretermit discussion of defendants’ first assignment of error: "The trial court committed reversible error by incorrectly instructing the jury on damages in a lost chance of a better outcome case.”