DREW, J.
|, The primary issue is whether the jury erred in finding the doctor’s negligence during surgery did not cause any injury to the patient. Charlotte Patten and her husband, Rodney L. Patten, appeal the judgment rejecting their demands and dismissing the action with prejudice. They also seek review of the trial court’s denial of their motion for judgment notwithstanding the verdict (“JNOV”). For the reasons discussed herein, the judgment[1] is reversed in part and affirmed in part and rendered, awarding plaintiffs a portion of the damages sought.
FACTUAL AND PROCEDURAL BACKGROUND
Charlotte Patten became a patient of Dr. Christopher Gayle, an OB-GYN at Willis-Knighton Pierremont, in 1997 when Dr. Gayle performed a total abdominal hysterectomy, leaving her ovaries in place. In early 2001, Mrs. Patten began suffering from pain in her lower right abdomen which Dr. Gayle suspected was a cystic lesion on her right ovary. On August 14, 2001, at Willis-Knighton Pierremont, Mrs. Patten was admitted for laparoscopic[2] evaluation and possible removal of her ovaries.
Dr. Gayle, assisted by Dr. Mary Taylor, began the procedure by inflating the abdominal cavity with carbon dioxide in order to create space |2between the abdominal wall and internal organs. Once the *1183 cavity was inflated, Dr. Gayle inserted an operative trocar[3] through the umbilicus.
The operative trocar blade is covered with a protective sheath. When the doctor applies pressure to the trocar, the blade is unsheathed, allowing the trocar to penetrate the skin, muscle, and fascia. Once the trocar encounters “empty space” in the body cavity, the sheath re-covers the blades and locks in place. Since the initial trocar insertion is performed blind, most laparoscopic injuries occur during this part of the procedure.[4] In this case, Dr. Gayle inserted the first trocar without complication.
After removing the blade from the tro-car tube, Dr. Gayle inserted a laparoscope into this first trocar to allow him to see the inside of the abdominal cavity. Dr. Gayle noted adhesions of the small bowel to the abdominal wall. Because he was unable to determine whether he would be able to proceed laparoscopically, Dr. Gayle intended to insert a second trocar so he could better visualize the ovaries and abdominal cavity.
After using the laparoscope in the first trocar to find an area that was free of adhesions, Dr. Gayle testified he tried to angle the second trocar so it would enter the abdominal cavity in a particular direction. The second trocar unexpectedly entered the patient’s abdomen. The doctor claimed the amount of force he applied should not have been sufficient for the trocar to enter the abdomen. The second trocar entered the abdomen in a different direction than Dr. Gayle intended and came out near a bowel adhesion.
IsAlthough Dr. Gayle could see the tip of the trocar, he could not determine whether the trocar had penetrated or avoided the bowel. Dr. Gayle left the second trocar tube in place but removed the blade. He then inserted a third trocar (without incident) and placed the laparoscope into the third trocar to evaluate the bowel. Dr. Gayle observed no bleeding or bowel content but was still unable to determine whether the bowel had been punctured.
Dr. Gayle decided he needed to open the patient’s abdomen because there were numerous adhesions of the bowel to the abdominal wall. The doctor also concluded that the right ovary, which was cystic and densely adhered to the pelvic wall, needed to be removed, a procedure that could not be performed laparoscopically. Finally, he was still concerned about the possibility of bowel injury by the second trocar.
After making a Pfannenstiel incision[5] and lysing[6] some of the adhesions of the bowel from the abdominal wall, Dr. Gayle saw the second trocar had penetrated Mrs. Patten’s small bowel “through and through.” Dr. Gayle brought approximately 20 inches of bowel out of the abdominal cavity and called for Dr. Craig Bozeman, a general surgeon, to perform *1184 emergency surgery to remove the trocar[7] and repair the bowel.[8]
14Pr. Bozeman decided to connect the two holes to facilitate the surgical repair. He did so by cutting across the circumference of the bowel between the two holes. After sewing up the bowel, Dr. Bozeman “ran the bowel”[9] to inspect it and found the repair was effective (not leaking) and that no further injuries could be seen. Dr. Gayle and Dr. Taylor then finished the surgery by removing Mrs. Patten’s right ovary, placing the bowel back inside the abdomen and closing the incisions.
After the operation, Mrs. Patten was kept under observation by Dr. Bozeman to ensure her bowel was causing no further problems. Over the next few days, she showed some signs of improvement in her gastrointestinal functions but also had indications of trouble, most notably swelling. Five days after the operation, Mrs. Patten was examined by Dr. Schwalke, who was on call for Dr. Bozeman. That morning, Mrs. Patten’s abdomen was distended. Later that day, feculent material began exuding from her incision.
Dr. Schwalke performed emergency exploratory surgery, which required him not only to reopen her horizontal incision but to make a vertical “midline” incision up to the sternum. He discovered a 8mm perforation of the bowel two inches from where the bowel had been repaired by Dr. Bozeman five days earlier. Also, approximately three liters of feculent material was in Mrs. Patten’s abdominal cavity, necessitating extensive cleaning and drainage.
Is As a result of the feculent material having leaked into her abdominal cavity, Mrs. Patten developed peritonitis (an abdominal infection) and pneumonia. She was hospitalized until August 30. Mrs. Patten has subsequently suffered from abscesses (some of which ruptured) and herniating of her incisions, both of which have required further surgeries, and additional medical problems.
On June 6, 2002, Mrs. Patten and her husband filed a petition for a medical review panel against Dr. Gayle, Dr. Taylor, and Dr. Bozeman. The Pattens alleged negligence against the three doctors with respect to the August 14 surgery performed by Dr. Gayle and Dr. Taylor, in which Mrs. Patten’s bowel was penetrated by a trocar, and Dr. Bozeman’s emergency surgical repair.
The medical review panel (composed of Dr. Daniel Carroll, Dr. Edwin Byrd, and Dr. Timothy Hart) ruled that the evidence did not support the conclusion that Dr. Gayle, Dr. Taylor, or Dr. Bozeman failed to meet the applicable standards of care. Specifically, the panel found no evidence indicating the perforation discovered by Dr. Schwalke was present on August 14 and missed by Dr. Bozeman during his repair. The panel concluded that this perforation was most likely the result of undetectable microvascular damage that was unrelated to the trocar injury. Further, *1185 the panel opined that Dr. Gayle did not “lose control” of the trocar because | fithere are many factors[10] outside of the surgeon’s control that can affect the passage of the trocar through the abdomen.[11]
On February 6, 2004, Mrs. Patten, together with her husband, filed a medical malpractice suit against Dr. Gayle.[12] Following a four-day jury trial on the merits in May 2010, the jury returned a verdict that Dr. Gayle had deviated from the applicable standard of care and had committed malpractice.[13] The jury, however, found Dr. Gayle’s negligence had not caused any injury that would otherwise not have been incurred by Mrs. Patten. Finding a lack of causation, the jury awarded no damages to Mrs. Patten or her husband. At the request of counsel, the jury was polled, revealing the jury was split 10-2.
Following entry of the judgment denying plaintiffs’ recovery and dismissing the action at their cost, Mrs. Patten and her husband moved for a JNOV, arguing the jury’s finding that Dr. Gayle’s negligence caused no injuries was manifestly erroneous. Following a hearing, the trial court denied the motion, finding the jury’s verdict was reasonable, and entered judgment accordingly on August 27, 2010.
17Mrs. Patten and her husband appealed, arguing: (1) the jury manifestly erred in finding a lack of causation; (2) the trial judge manifestly erred in denying the motion for JNOV; and (3) the jury erred in failing to award damages.
DISCUSSION
In a medical malpractice action, the plaintiff has the burden of proving: (1) the applicable standard of care, (2) that the standard of care was breached, and (3) that as a proximate result of the breach the plaintiff sustained injuries that would not otherwise have been incurred. La. R.S. 9:2794(A). The third element, causation, is subject to the manifest error standard of review. Lovelace v. Giddens, 31,493 (La.App.2d Cir.2/24/99), 740 So.2d 652, writ denied. Under the manifest error standard, an appellate court cannot substitute its own inferences and conclusions about the facts. Johnson v. Morehouse General Hosp., 2010-0387 (La.5/10/11), 2011 WL 1759932; Wooley v. Lucksinger, 2009-0571 (La.4/1/11), 2011 WL 1205136. Findings of fact cannot be set aside or overturned by the appellate court unless they are clearly wrong. Johnson, supra. Factual conclusions are not clearly wrong when the factfinder chooses a view of the evidence that an appellate court disagrees with as long as the factfinder’s view is permissible. Id. Manifest error occurs only when there is “no reasonable factual basis for the [factfinder’s] eonclusion[.]” *1186 Johnson, 2010-0387 at p. 6, 63 So.3d at 93. In a medical malpractice claim, great deference should be given to the factfinder when medical experts express different opinions relevant to causation. Lovelace, supra.
| fjnilial Trocar Injury
While recognizing that Mrs. Patten suffered injuries, the Medical Review Panel unanimously found that Dr. Gayle was not negligent. In its written reasons, the panel stated there were other factors outside of Dr. Gayle’s control that could have caused the second trocar to become misdirected, including scarring of the abdominal wall, defects from her prior surgeries and differences in the degree of sharpness of trocars.
Dr. Robert Zurawin, a board-certified OB-GYN and an associate professor at Baylor Medical School, testified by affidavit, deposition, and at trial on behalf of Mrs. Patten. Disagreeing with the medical review panel, Dr. Zurawin believed Dr. Gayle was negligent. Dr. Zurawin stated the factors mentioned by the review panel were relevant only to a blind trocar insertion. Since Dr. Gayle had already inserted one trocar, he should have been able to see (and thus avoid) any problems inside the abdominal cavity. At trial, Dr. Zurawin testified the trocar must have penetrated bowel that was adhered to the abdominal wall. Otherwise the protective sheath would have covered the blade after entering the abdomen and the through-and-through puncture never would have occurred.
Dr. Zurawin also noted that Dr. Gayle had apparently been holding the second trocar improperly. In his deposition, Dr. Gayle indicated he was not yet holding the second trocar in the proper position when it penetrated the abdomen. Dr. Zurawin testified the way Dr. Gayle was holding the trocar contributed to the trocar penetrating the abdomen without Dr. Gayle intending it to as well as how deep it penetrated. Further, Dr. Zurawin labelieved the second trocar should never have been inserted because Dr. Gayle should have converted to an open surgery once he saw the numerous, dense adhe-sions through the laparoscope in the first trocar.
Dr. Gayle admitted the puncture of the bowel by the second trocar was an injury. In his original answer to the complaint, Dr. Gayle stated that Dr. Bozeman was called in for “repair of a bowel injury.” Moreover, at trial, Dr. Gayle admitted on cross-examination that Mrs. Patten “was injured and she suffered as a result of that injury[.]” Dr. Gayle claimed that the tro-car injury was insignificant as far as the medical malpractice claim was concerned.
Dr. Gayle relied upon the testimony of Dr. Taylor, Dr. Schwalke, and Dr. Byrd, each of whom testified the initial bowel injury from the second trocar was insignificant. Both Dr. Taylor and Dr. Byrd testified the only harm done to Mrs. Patten was having approximately an extra hour of surgery by Dr. Bozeman to repair the bowel. Dr. Schwalke testified similarly, stating the injury was insignificant because it was immediately recognized and repaired and there were no further damages resulting from that injury.
Dr. Gayle also relied upon two consent forms that Mrs. Patten signed pri- or to the surgery. When obtaining consent from a patient for any treatment or procedure, physicians have a duty to advise the patient of associated risks. Rob *1187 erts v. Cox, 28,094 (La.App.2d Cir.2/28/96), 669 So.2d 633; Broadway v. St. Paul Ins. Co., 22,438 (La.App.2d Cir.1991), 582 So.2d 1368. A physician does not have to inform a patient of “every | inconceivable possibility” but only “those that can reasonably be anticipated.” Steinbach v. Bayfield, 428 So.2d 915 (La.App. 1st Cir.1983) (reversed on other grounds); see also, Roberts, supra; Broadway, supra.
A risk of bowel injury was among the risks listed on the consent forms signed by Mrs. Patten. Dr. Hart testified at trial that this risk would include bowel injury due to a misdirected trocar. Dr. Hart also testified, however, that a patient never consents to negligent treatment. This court agrees. Consent forms should not shield physicians and other healthcare providers from liability for injuries caused by their negligence simply because the injuries are a known risk of the procedure. While patients can be held to reasonably anticipate that procedures carry certain risks that may occur without any fault from their physician, patients should also reasonably anticipate a physician will not negligently injure them. Being injured as a result of negligence by one’s physician is not a reasonably foreseeable risk of receiving medical treatment.
The through-and-through perforation of Mrs. Patten’s bowel was undoubtedly an injury. Downplaying the significance of the injury is a defense to damages but not a defense to the injury actually having occurred. The two consent forms signed by Mrs. Patten do not exonerate Dr. Gayle for negligently injuring her by puncturing her bowel with the second tro-car. Therefore, the jury’s finding that Dr. Gayle’s negligence caused no injury to Mrs. Patten is manifestly erroneous with respect to the trocar’s penetration of the bowel. As a result, this court reviews the merits of this issue de novo.
| nDe Novo Review of the Merits — Initial Trocar Injury
Dr. Gayle negligently punctured Mrs. Patten’s bowel with a trocar, necessitating the emergency repair by Dr. Boze-man. According to Dr. Gayle, aside from the repair of the punctured bowel, all other surgical steps taken on August 14 would have been required even if there had been no bowel injury.
First, Dr. Gayle stated in his deposition that Mrs. Patten had to be “opened up” in order to remove her ovary. Therefore, the decision to open her abdomen would have been made even if there were no bowel injury. This view was shared by Dr. Taylor. Even Dr. Zurawin agreed, stating in his affidavit that Mrs. Patten should have been opened up after Dr. Gayle viewed Mrs. Patten’s numerous abdominal adhe-sions through the laparoscope in the first trocar.
Second, Dr. Gayle testified the bowel adhesions had to be lysed from the abdominal wall in order to remove the right ovary. Both Dr. Schwalke and Dr. Hart agreed that lysing the adhesions would have been necessary without the trocar injury. Moreover, even had the trocar injury been the sole reason for lysing the bowels, Dr. Zurawin testified that Dr. Gayle did not breach the applicable standard of care by lysing the bowel adhesions to prepare for the surgical repair of the bowel injury by Dr. Bozeman.
Third, Dr. Zurawin stated in his deposition that it is within the applicable standard of care to run the bowel after lysing any bowel adhesions to ensure it has not been injured. Therefore, the bowel would *1188 necessarily have been run whether or not the trocar repair was performed.
| ^Fourth, Dr. Gayle stated in his motion in limine to exclude medical expenses that, even without the trocar injury, Mrs. Patten would have stayed in the hospital a few days following the surgery for observation. Dr. Gayle stated this was necessary because having to lyse her bowel adhesions created a possibility of a perforation developing.
In contrast, Dr. Zurawin stated in his affidavit that, but for the trocar injury to the bowel, Mrs. Patten would not have undergone the repair procedure which placed her at a greater risk of a subsequent bowel perforation. However, Dr. Zurawin acknowledged that Dr. Gayle had to open Mrs. Patten up and lyse the bowel adhesions to complete his surgery whether or not there had been a bowel injury.
Aside from the repair of the through- and-through bowel puncture, all other treatments and steps taken (opening her up, lysing the adhesions, etc.) would have been necessary even had there been no bowel injury and therefore were not causally related to Dr. Gayle’s negligence. The only injuries Mrs. Patten suffered on August 14, 2001, that were causally connected to Dr. Gayle’s negligent handling of the second trocar and would not otherwise have been incurred are: (1) the puncture of the bowel; and (2) the time and expense of Dr. Bozeman repairing the bowel.

Subsequent Perforation

The cause of the subsequent perforation that was discovered by Dr. Schwalke five days after Mrs. Patten’s first operation was the primary topic throughout this case. In Dr. Gayle’s opinion, this subsequent perforation was most likely the result of a microvascular injury that was undetectable at [ 1sthe time of Dr. Bozeman’s repair. The medical review panel had a similar opinion, finding the perforation was unrelated to the initial tro-car injury and most likely the result of microvascular damage.
Dr. Zurawin stated in his affidavit that while the cause of the perforation was “not clear,” he believed it was most likely caused directly by the second trocar striking a loop of bowel after making its through-and-through puncture. Dr. Hart, Dr. Bozeman, and Dr. Schwalke all testified that the trocar tip could have directly harmed another section of bowel, causing damage that eventually led to the subsequent perforation. Dr. Hart qualified his testimony, stating this scenario was highly unlikely.
Both Dr. Gayle and Dr. Taylor testified the trocar penetrated the abdomen in an area where there was an upside-down “U-shaped” section of bowel hanging from the abdominal wall. Thus, according to the only two people who saw the location of the bowel before Mrs. Patten was opened up, there was no other portion of bowel for the trocar to damage. Assuming the bowel was adhered in this position, Dr. Byrd testified it would have been “spectacular” for the tip of the second trocar to have directly injured another part of the bowel.
Moreover, the bowel was run and inspected by Dr. Bozeman after he repaired the initial puncture. This inspection was done in the presence of both Dr. Gayle and Dr. Taylor. Dr. Bozeman testified he examined a significant portion of the surrounding bowel. The perforation that was found five days later was only two inches from the repair site. Dr. Hart testified it would be almost impossible for Dr. Boze-man, Dr. Gayle, and Dr. luTaylor all to have missed any visible injury to the bowel *1189 that was only two inches away from the site of the trocar puncture.
In addition, the opinion of the review panel was that the timeline indicated the perforation was not present on August 14. The panel opinion was supported by both Dr. Hart’s and Dr. Schwalke’s testimony that the perforation likely opened two or three days after Dr. Gayle’s operation, based on when Mrs. Patten began having swelling problems and the amount of fecu-lent material found in her abdominal cavity. Dr. Zurawin disagreed, stating in his deposition that a small perforation might have taken five days to manifest and therefore the timeline was not definitive.
In view of all the evidence presented, it seems unlikely the trocar tip directly caused damage to the bowel that led to the subsequent perforation. However, Mrs. Patten also presented evidence of another theory: that the trocar injury indirectly caused the perforation because it led to the bowel sustaining a partial thickness injury [14] which ruptured in the days following Dr. Gayle’s surgery. This partial thickness injury could have been caused either when the adhesions were lysed from the abdominal wall or when Dr. Bozeman was performing his repair of the initial trocar injury.
Dr. Carroll stated in his deposition that any partial thickness injury caused by Dr. Bozeman repairing and running the bowel should have occurred immediately adjacent to the original injury. Since the perforation was two inches away from the original injury, Dr. Carroll stated it was 11shighly unlikely Dr. Bozeman’s repair caused the perforation. Additionally, none of the medical experts who testified believed that either repairing or running the bowel indirectly caused the perforation.
Dr. Schwalke testified that the most likely cause of the perforation was a partial thickness injury that occurred when the bowel adhesions were lysed from the abdominal wall. Both Dr. Hart and Dr. Byrd also agreed the cause of the perforation was most likely a partial thickness injury due to lysing adhesions. According to Dr. Gayle, the portion of bowel where the perforation occurred was adhered to the abdominal wall, making it more susceptible to a partial thickness injury. Dr. Bozeman testified that a partial thickness injury is a known risk of having to lyse bowel adhesions.
In his deposition, Dr. Zurawin stated it was within the applicable standard of care for Dr. Gayle to lyse the bowel adhesions. Dr. Zurawin also noted that it was unclear whether Dr. Gayle or Dr. Bozeman lysed the bowel that was two inches away from the trocar injury. Therefore, assuming the lysing of the bowel caused a partial thickness injury, it would be impossible to know to whom to attribute it. Moreover, even if the lysing caused an undetectable injury, Dr. Zurawin testified there would not have been a breach of any standard of care by Dr. Gayle.
The medical experts were in agreement that the bowel adhesions necessarily had to be lysed in order to remove Mrs. Patten’s right ovary. Therefore, had no tro-car injury ever occurred, the bowel adhe-sions would nonetheless have been lysed. This possibility was explicitly supported in the deposition testimony of all three mem *1190 bers of the medical review panel |1ñ(Dr. Byrd, Dr. Hart, Dr. Carroll) as well as the trial testimony of both Dr. Schwalke and Dr. Byrd.
Mrs. Patten had to be opened up and her adhesions had to be lysed. The evidence did not show that, more likely than not, the initial trocar injury was either a direct or indirect cause of the subsequent perforation and the resulting peritonitis and pneumonia which kept Mrs. Patten hospitalized until August 30, 2001. As Dr. Zurawin testified, the cause of this perforation is simply not clear “within a reasonable medical probability.” Therefore, the jury finding no causation of damages with respect to the subsequent perforation is not manifestly erroneous.

Injuries Suffered by Mrs. Patten Since August 30, 2001

Mrs. Patten has suffered from many medical problems following her release on August 80, 2001, after recovering from peritonitis and pneumonia. She alleges that these subsequent injuries are traceable to Dr. Gayle’s negligence. Among the injuries Mrs. Patten has suffered, according to her First Supplemental and Amending Petition:
abscesses ... excruciating pain and suffering, mental anguish and embarrassment ... extensive scarring, abdominal adhesions and extensive internal adhe-sions ... and repeated surgical procedures^]
Mrs. Patten also claims hernias of her incisions as an additional injury attributable to Dr. Gayle.
According to Mrs. Patten’s own testimony, she had a history of abdominal pain and discomfort ever since the birth of her second child. Her first laparoscopic procedure was performed in 1993. She also had multiple abdominal surgeries performed prior to the surgery on August 14, 2001. As 117Pr. Zurawin stated in his deposition, the more surgeries a person has, the more likely she is to have bowel adhesions in the future that could lead to the injuries Mrs. Patten has suffered. Mrs. Patten also testified she had off-and-on undergone treatment for depression prior to Dr. Gayle’s 2001 surgery.
In the months following the surgeries by Dr. Gayle and Dr. Schwalke, Mrs. Patten was treated by Dr. Bozeman for multiple abscesses of her surgical wounds. In his deposition, Dr. Bozeman stated these abscesses were likely not related to Mrs. Patten’s peritonitis but rather a reaction to the sutures used by Dr. Schwalke.
In 2002, Mrs. Patten was treated by Dr. Charles Black for hernias of her incisions. Dr. Black’s deposition was read at trial; he was unable to testify in person because he was suffering from health problems and subsequently died. In his deposition, Dr. Black stated that incisional hernias occur around 5% of the time even in the absence of negligence. Dr. Black further stated that, considering Mrs. Patten’s history of abdominal surgeries, there was no reason to attribute her hernias in 2002 to either Dr. Gayle’s or Dr. Schwalke’s surgeries in 2001.
Dr. Dale McGinty treated Mrs. Patten for abdominal adhesions sporadically between 2005 and 2008. In his deposition, Dr. McGinty stated he had no reason to connect those adhesions to Dr. Gayle’s surgery. Further, Dr. McGinty stated there was no way to know whether the adhesions he treated were caused by Dr. Gayle’s surgery, any of Mrs. Patten’s prior or subsequent abdominal surgeries.
| lsDr. Hart testified that hernias of the midline incision are traceable to Dr. *1191 Schwalke’s surgery, as this was the first time such an incision had been made on Mrs. Patten. Hernias of any other incisions, though, are not necessarily connected to Dr. Gayle’s surgery because any of Mrs. Patten’s pre-2001 surgeries could have been the underlying cause.
After sitting on the medical review panel, Dr. Byrd testified in his deposition that it is hypothetically possible none of the injuries Mrs. Patten suffered are causally connected to Dr. Gayle. In other words, even had there been no trocar injury, it is possible that the subsequent bowel perforation would have occurred, that Mrs. Patten would develop an abdominal infection from the material leaking from the perforation, and that all of her hernias, abscesses, and adhesions might have occurred as anticipated risks of the surgeries performed by Dr. Gayle and Dr. Schwalke.
Having failed to show the subsequent perforation of her bowel was causally connected to Dr. Gayle’s negligence, Mrs. Patten did not establish that injuries she has suffered since August 30, 2001, were caused by Dr. Gayle. Thus, the jury finding no causation of any damages with respect to Mrs. Patten’s medical problems since August 30, 2001, is not manifestly erroneous.

Damages

The only injuries that Mrs. Patten has suffered as a result of Dr. Gayle’s negligence are the puncture of her bowel by the second trocar and the time and expense of Dr. Bozeman repairing the bowel injury.
| ,9Dr. Gayle claimed the trocar injury itself was insignificant. Three medical experts (Dr. Taylor, Dr. Schwalke, and Dr. Byrd) also testified the injury was insignificant because it was immediately recognized, repaired, and no future harm resulted from it. Mrs. Patten presented no evidence showing the bowel injury from the second trocar caused any significant harm after its repair.
In his motion in limine to exclude certain medical expenses, Dr. Gayle argued the only medical expenses that were related to his August 14 surgery on Mrs. Patten are as follows: Dr. Gayle ($3,331.20); Willis-Knighton Pierremont ($18,546.85), Pierremont Anesthesia Consultants ($1,647.00), and Dr. Bozeman ($1,803.00), totaling $25,328.05.
Dr. Gayle’s fee for the operation would have been incurred even without a bowel injury. Therefore, these expenses ($3,331.20) are not recoverable as damages.
Most of the expenses owed to Willis-Knighton Pierremont also would have been incurred even if there were no bowel injury. Some of the expenses, however, are causally connected to Dr. Gayle’s negligence. Upon review of the Willis-Knigh-ton medical bills, this court awards $1,726.00 owed to Willis-Knighton as damages attributable to Dr. Gayle negligently puncturing Mrs. Patten’s bowel.
Mrs. Patten was placed under anesthesia for Dr. Gayle’s surgery. However, additional anesthetic gases were necessary due to the extra time required for Dr. Bozeman to perform his repair. This court awards [⅞0$1,281.00 in damages recoverable against Dr. Gayle for services performed by Pierremont Anesthesia Consultants.
The services performed by Dr. Bozeman were necessitated by the bowel injury and would not otherwise have been required. All expenses owed to Dr. Bozeman ($1,803.00) are causally connected to Dr. *1192 Gayle’s negligence and recoverable as damages.
Accordingly, Mrs. Patten is awarded $4,811.00 in medical expenses attributable to injuries resulting from Dr. Gayle’s negligence.
There is next the issue of general damages, such as pain and suffering, which cannot be definitively measured in monetary terms. See McGee v. A C and S, Inc., 2005-1036 (La.7/10/06), 933 So.2d 770. Mrs. Patten claimed general damages for pain and suffering, mental anguish, disfigurement, and decreased quality of life. In closing arguments, counsel for plaintiff recommended general damages totaling $800,000 to Mrs. Patten as well as $250,000 to Mr. Patten for decreased quality of life and loss of consortium.
These claims all are connected to the perforation discovered by Dr. Schwalke and Mrs. Patten’s subsequent medical problems, not the initial trocar injury. Because the jury did not manifestly err in finding Dr. Gayle’s negligence was not the cause of the subsequent perforation, no general damages are warranted for these claims.
The claims for pain and suffering and mental anguish are compensable. While the majority of Mrs. Patten’s pain and suffering and anguish are attributable to the subsequent perforation, the initial tro-car | ^injury also caused some general damages. Mrs. Patten testified at trial that the day of Dr. Gayle’s surgery was her daughter’s first day of school. Rather than going home that afternoon, as she expected, Mrs. Patten was hospitalized for a total of 16 days. When she awoke after the first surgery and was told by her husband that there was a problem, Mrs. Patten thought she had cancer. Mrs. Patten also testified she is now somewhat paranoid because Dr. Gayle was unable to explain what went wrong.
Accordingly, Mrs. Patten is awarded $10,000 in general damages for pain and suffering and mental anguish.
CONCLUSION
The portions of the final judgment concluding plaintiffs suffered no injuries from Dr. Gayle puncturing Mrs. Patten’s bowel are manifestly erroneous and are reversed. Judgment is rendered awarding her special and general damages. In all other respects, the judgment is affirmed.
DECREE
The judgment of the trial court is REVERSED IN PART and AFFIRMED IN PART, and judgment is rendered in favor of appellants, awarding them the amount of $14,811.00. Appellee is cast with all costs of the appeal.

. As a result of partially reversing the first judgment, consideration of the second judgment is unnecessary. The denial of the JNOV would, however, be affirmed and reversed along the same grounds.

. Laparoscopic surgery involves inserting small, hollow tubes, known as trocars, into the patient and operating by inserting scopes and instruments down the tubes. A small camera (laparoscope) can be inserted into these tubes for evaluation. Surgical instruments can also be inserted into trocars. A laparoscopy is a minimally invasive procedure because it does not involve "opening the patient up.”

. An operative trocar is a trocar with a sharp blade at the tip. It is used for initial penetration of the trocar into the abdominal cavity-

. Dr. Robert Zurawin, medical expert for Mrs. Patten, testified that 95-98% of trocar-related injuries occur during insertion of the first trocar.

. A Pfannenstiel incision is a long horizontal abdominal incision, also called a '‘bikini” incision.

. Lysing is a term used to describe the detachment of bowel adhesions from the abdominal wall by cutting it with specialized surgical scissors.

. Dr. Gayle testified he left the trocar in place to allow Dr. Bozeman to remove it. Dr. Bozeman testified the trocar had already been removed when he arrived. This point is of no consequence to the disposition of this appeal.

. All medical experts and the medical review panel agreed that calling in a general surgeon for the purpose of repairing the bowel injury was within the applicable standard of care.

.Running the bowel is the inspection of the bowel by hand, moving it back and forth in one’s hands, squeezing and applying pressure to check for leaks, bruises, cuts, and other damage.

. These factors explicitly included ‘‘fascial scarring or defects from prior surgery and differences in the degree of sharpness of disposable trocars.” (Opinion of Medical Review Panel, p. 2)

. Members of the panel admitted to placing greater weight on Dr. Gayle’s operative note than on his sworn deposition, in which he admitted to losing control “in a generic sense.” (Deposition of Dr. Gayle, p. 67-68; Deposition of Dr. Hart, p. 18-19; Deposition of Dr. Carroll, p. 23)

. On October 23, 2007, Mrs. Patten amended her complaint and added Dr. Bozeman as a defendant. Dr. Bozeman filed peremptory exceptions of prescription and peremption, which were granted, and Dr. Bozeman was dismissed from the suit.

. Dr. Gayle has not contested this finding on appeal so we will not discuss the issue in depth.

. The bowel has multiple layers. A partial thickness injury is when some of the layers have been damaged. A partial thickness injury can later develop into a perforation due to pressure within the bowel.