COX, J.
Wynona Johnson ("Mrs. Johnson") brought a medical malpractice action against defendants, Tyrone Tucker, M.D. ("Dr. Tucker") and Richland Parish Hospital ("RPH"), for the death of her husband, Robert Johnson ("Mr. Johnson"). The appointed Louisiana Medical Review Panel found Dr. Tucker did not breach the applicable standard of care while treating Mr. Johnson. A jury trial followed the medical review panel's decision. The jury unanimously found that Dr. Tucker breached the applicable standard of care, which they found to be the proximate cause of Mr. Johnson's death. The defendants appeal *1239 the jury's findings. For the following reasons, we affirm.
FACTS
On June 13, 2011, Mr. Johnson visited his family physician, Dr. José Enriquez, at his clinic located at RPH. Mr. Johnson complained of shortness of breath, chest tightness, and right leg pain, which worsened when walking. Dr. Enriquez sent Mr. Johnson to the RPH emergency department. Mr. Johnson was accompanied to the emergency department by a nurse with a note listing the reasons for the transfer as chest tightness, hypoxia (shortness of breath), and a history of asthma. Dr. Tucker was the emergency department's physician on duty and examined Mr. Johnson.
When Mr. Johnson arrived in the emergency department at 10:06 a.m., his chief complaints were of chest pain and right leg pain. The emergency room nurse noted Mr. Johnson's leg pain began one week prior to his arrival in the emergency department. Dr. Tucker examined Mr. Johnson's chest and ordered a complete blood count (CBC) with differential, complete metabolic panel, brain natriuretic peptide (BNP) test, thyroid stimulating hormone (TSH ) test, electrocardiogram (EKG), chest X-ray, cardiac monitor, oxygen at two liters per nasal cannula, pulse oximeter, heparin lock, and cardiac enzymes. The CBC, EKG, and chest X-ray were all normal. TSH and BNP were within normal limits. The cardiac enzymes were negative. His metabolic panel tests were within normal ranges except the blood urea nitrogen and lactate dehydrogenase, which were slightly elevated.
In his first assessment, Dr. Tucker's impression was Mr. Johnson had "chest pain, rule out unstable angina, more consistent with costochondritis." Dr. Tucker's treatment plan was to monitor Mr. Johnson over the next several hours and then obtain a second set of cardiac enzymes six hours after the first set. If the second set of enzymes came back negative, Mr. Johnson would be discharged. While in the emergency room, Mr. Johnson was given aspirin, nitroglycerin paste, Toradol, intravenous fluids, and breathing treatments.
The second set of cardiac enzymes was obtained and the results were negative. Dr. Tucker testified that he associated Mr. Johnson's leg pain with polyarthritis, although he did not specify this diagnosis in the medical record. Dr. Tucker testified he examined Mr. Johnson and stated there was no discoloration or swelling in the leg. Dr. Tucker noted in Mr. Johnson's medical record on the muscular skeletal exam that Mr. Johnson was "within normal limits." Mr. Johnson's pain was worse when walking, which Dr. Tucker found to be more consistent with arthritic pain. Dr. Tucker noted hypertension in Mr. Johnson's chart. He visited Mr. Johnson at 5:00 p.m., discharging him with instructions to follow up with his primary care physician in the morning.
Mr. Johnson left RPH at 5:37 p.m. After arriving home, Mr. Johnson collapsed in the presence of Mrs. Johnson. At about 6:20 p.m., Northeast Louisiana Ambulance received a call from Mrs. Johnson stating Mr. Johnson was not breathing. Paramedics arrived at Mr. Johnson's home around 6:26 p.m. They found Mr. Johnson lying on the floor while family performed cardiopulmonary resuscitation (CPR). Mr. Johnson was apneic and did not have a pulse. Paramedics continued CPR and administered multiple doses of epinephrine, atropine, and bicarbonate. Paramedics were able to obtain a chemical rhythm and transported Mr. Johnson to RPH.
At 6:44 p.m., paramedics arrived at RPH with Mr. Johnson. Mr. Johnson was unresponsive upon arrival and a code blue was immediately issued. Despite resuscitation efforts, Mr. Johnson was pronounced dead *1240 at 7:02 p.m. An autopsy was ordered and revealed Mr. Johnson's cause of death to be multiple small peripheral emboli (PE) in the left lung and a large saddle embolus obstructing the left pulmonary artery.
On April 24, 2012, Mrs. Johnson filed a request for review with the Division of Administration and requested the formation of a Medical Review Panel proceeding. Mrs. Johnson requested the Medical Review Panel determine whether Dr. Tucker breached the appropriate standard of medical care in the diagnosis and treatment of Mr. Johnson and whether this breach caused Mr. Johnson's death. In August 2012, plaintiff appointed Dr. Thoma to the medical review panel.
The attorney chairman of the medical review board sent a letter to Dr. Thoma notifying him of his appointment and forwarding to him the oath that all panelists must sign, as required by the Medical Malpractice Act. The oath must be signed in the presence of a notary and states, "I, [Todd Thoma, M.D.] do solemnly swear that I will faithfully perform the duties of a medical review panel member in the matter styled, [Robert Johnson, et al versus Dr. Enriquez, Dr. Tucker, Richland Parish Hospital, Delhi Rural Health Clinic, PCF file No. 2012-00429] to the best of my ability and without partiality or favoritism of any kind. I acknowledge that I represent neither side and it is my lawful duty to serve with complete impartiality and to render a decision in accordance with the law and the evidence..."
After plaintiff appointed Dr. Thoma to the panel, plaintiff contacted Dr. Thoma and retained him as an expert. On March 13, 2013, Dr. Thoma prepared and sent an expert report to plaintiff. The panel was then sent submissions prepared by both parties to review. Defendants found that plaintiff's submission to the panel included an expert report prepared by Dr. Thoma, who was also a member of the panel. Plaintiff then requested Dr. Thoma be removed from the panel and a new panel member was selected. The panel subsequently found in favor of Dr. Tucker in a unanimous opinion on September 23, 2014. On October 23, 2015, Mrs. Johnson filed a lawsuit and the case proceeded to trial.
Dr. Kyle Happle testified that Mr. Johnson's cause of death, pulmonary embolism (PE), is a type of blood clotting in the lungs. He stated PE occurs when a blood clot has broken off from somewhere in the body and travels through the patient's veins, through the heart, and into the lungs. Dr. Thoma stated a ventilation-perfusion (VQ) scan, computed tomography angiography (CTA) scan, or computerized axial tomography (CAT) scan with angiography is used to take a picture of the lung in order see blood clots. Dr. Thoma reviewed records from RPH and confirmed these scans were not available at RPH in June 2011.
Dr. Happle stated deep vein thrombosis (DVT) is a type of blood clotting in the legs. Jack McFarland, Jr., lab manager for RPH, testified to the following regarding the D-dimer test. A D-dimer is a blood screening test to determine whether or not somebody has a blood clot. A D-dimer is used to screen for any type of blood clotting, including PE and DVT. The D-dimer is a reliable way to test for clotting activity, but not to actually diagnose blood clotting because there are other factors that can elevate a D-dimer. As of June 2011, RPH did not have the lab equipment to perform a D-dimer test. The procedure for RPH to perform a D-dimer test was to collect the blood sample and send the sample to an outside laboratory.
Gwyn Ogden, director of radiology at RPH, stated ultrasounds of the veins can be used to diagnose DVT by detecting the presence of blood clots in the veins. She also stated that prior to June 2011, ultrasounds *1241 were used in the emergency department of RPH for the purpose of screening for blood clots.
Dr. Happle testified that PE and DVT are both treated by giving the patient a blood thinner in order to keep the blood clot from growing and allow the body to absorb the clot. He stated blood thinners and diagnostic tests are ordered to prevent the clot from moving into the lungs, which is fatal. Dr. Thoma stated, and the other physicians agreed, that when both testing and treatment are performed, PE and DVT have a 90 to 95% survival rate. They also agreed that about one third of the patients with PE who go untreated will die.
At trial, Dr. Tucker stated he felt there was a low probability of PE when diagnosing Mr. Johnson. Costochondritis is common in people who have polyarthritis, which Dr. Tucker felt could explain the chest pains. Dr. Tucker also felt Mr. Johnson's history of untreated hypertension and asthma were causes for his chest pain. He stated there was no discoloration or swelling of Mr. Johnson's leg, which led him to eliminate DVT in his diagnosis. Dr. Tucker stated he ordered Mr. Johnson be administered Toradol for the arthritis in his leg and costochondritis in his chest. The breathing treatment was ordered for Mr. Johnson's shortness of breath. Dr. Tucker stated these two treatments alleviated Mr. Johnson's complaints of pain and shortness of breath.
The plaintiff called Dr. Thoma to testify as to the standard of care for a physician working in a hospital's emergency department. Dr. Thoma is an expert in emergency medicine. Dr. Thoma reviewed the testimony of Dr. Tucker, death certificate, autopsy report, emergency room records, and clinic notes on Mr. Johnson from June 13, 2011. Dr. Thoma concluded that Mr. Johnson went to the emergency room with clear, classic signs and symptoms of DVT or PE because he had leg pain, chest pain, an elevated heart rate, and complaints of shortness of breath.
Dr. Thoma was of the opinion that Dr. Tucker did not comply with the standard of care that is taught to emergency room physicians. He stated he did not agree with Dr. Tucker's explanation of the leg pain because of arthritis. Dr. Thoma stated arthritis does not occur in the upper leg, but in the joints. He testified that if there is a low probability of PE, which was Dr. Tucker's opinion, the D-dimer test is part of the standard of care used to rule out PE.
Dr. Thoma believed the blood clot was in Mr. Johnson's leg at the time he went to the emergency room with chest and leg pain. The standard test he would have ordered to check Mr. Johnson's leg would have been an ultrasound. Dr. Thoma stated Dr. Tucker was clearly outside the standard of care with high probability of patient harm.
On cross-examination, the defendants sought to confront Dr. Thoma with his signed panel oath. Plaintiff objected and requested a bench conference. The trial court excused the jury and conducted the hearing outside the jury's presence.
The defendants argued before the trial court that they sought to include the signed panel oath to demonstrate Dr. Thoma was not credible because "his word is no good if he signs an oath that means nothing to him." The plaintiff argued Louisiana Code of Evidence article 403, stating the probative value was outweighed by the potential to mislead and confuse the jury. Dr. Thoma stated he had no recollection of being appointed to the medical review panel or signing the oath. He also explained that he serves on multiple medical review panels every year and his opinion would be the same regardless of whether he was a retained expert or panelist. The trial court ruled that line of questioning would not be *1242 allowed because it was prejudicial and served no practical purpose. The trial court further stated, "...he signed an oath on a panel that he never actually served on, that doesn't reflect bias..."
Dr. Happel is an expert in pulmonary medicine and critical care. Dr. Happel reviewed Mr. Johnson's emergency room records, medical history records, autopsy report, death certificate, Dr. Tucker's deposition, and the testimony of two of the three medical panel members. He testified the diagnosis of PE can be a "difficult" and "sneaky diagnosis." Dr. Happel testified that in many cases of PE, the classic signs and symptoms are not present. In Mr. Johnson's case of chest and leg pain, he would put PE and DVT at the top of his diagnosis list. He was of the opinion that although Mr. Johnson's symptoms and presentation were not "classic textbook constellation," he should have received a D-dimer test to be able to say with confidence that there was not a clot.
Dr. Enriquez is an expert in the field of family medicine. He testified to Mr. Johnson's medical history. Dr. Enriquez stated Mr. Johnson was noncompliant because he did not regularly take his medications and missed appointments. He testified he examined Mr. Johnson's leg and did not find any swelling, redness, or discoloration, which is typical in someone with DVT. Dr. Enriquez stated Mr. Johnson's leg pain, especially when walking, is more associated with arthritis. With a blood clot, he would expect pain regardless of sitting or standing.
Dr. Fred Yates is an expert in emergency medicine and served on the medical review panel for Mr. Johnson's case. Dr. Yates testified that the panel concluded Dr. Tucker met his standard of care when treating Mr. Johnson. When the suit proceeded to court, Dr. Yates was given copies of the other doctors' depositions. He testified that after reading the additional information, his opinion did not change. Dr. Yates was of the opinion Dr. Tucker absolutely did everything he was supposed to do in regard to Mr. Johnson. Dr. Yates stated that if Dr. Tucker felt another diagnosis was more likely than PE, then the criteria do not require him to look for PE.
Dr. Mark Haile is an expert in emergency medicine and served on the medical review panel for Mr. Johnson's case. Dr. Haile was also given depositions to review after the suit proceeded to court. Dr. Haile's opinion about whether or not Dr. Tucker committed medical malpractice had not changed. He felt Dr. Tucker was reasonable in treating Mr. Johnson and met the standard of care required of him.
The third physician on the medical review panel was Dr. Kerry Anders, an expert in the field of family medicine. Dr. Anders was also given depositions to review after the suit proceeded to court. His opinion had not changed since the medical review panel expressed its opinion in September of 2014. The use of the D-dimer test to screen for blood clots was not discussed until after the suit proceeded to trial. Dr. Anders testified that the discussion of whether or not a D-dimer should have been ordered did not change his opinion. He still felt Dr. Tucker met the standard of care.
Dr. Paul Schuler was called as an expert witness by the defendants. Dr. Schuler is an expert in the areas of pulmonology, critical care medicine, and internal medicine. Dr. Schuler reviewed Mr. Johnson's medical records, emergency room records, and depositions pertaining to this case. Dr. Schuler agreed with Dr. Tucker's opinion that PE was a low probability in Mr. Johnson. Dr. Schuler stated he would have tested Mr. Johnson for causes that were more likely than PE. He testified that if Dr. Tucker did not think there was a blood clot in Mr. Johnson's leg, then not ordering an ultrasound was acceptable.
*1243 The jury voted unanimously in favor of the plaintiff, Mrs. Johnson. The jury found the plaintiff proved the standard of care applicable to the defendant, that the defendant failed to comply with the standard of care, and the defendant's failure to comply with the standard of care proximately caused the patient's death. The jury awarded the plaintiff $500,000.
LAW
The defendants raise two issues on appeal. The first issue is whether the trial court erred in excluding credibility evidence during the cross-examination of Dr. Thoma. The second issue is whether the jury was manifestly erroneous in accepting Dr. Thoma's testimony concerning the standard of care and rejecting the testimony of four other medical experts.
Complaint of an alleged erroneous evidentiary ruling "may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected..." La. C.E. art. 103(A) ; Simmons v. Christus Schumpert , 45,908 (La. App. 2 Cir. 6/15/11), 71 So.3d 407, writs denied , 2011-1592 (La. 10/7/11), 71 So.3d 317, and 2011-1591 (La. 10/7/11), 71 So.3d 318. The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed absent a clear abuse of that discretion. On appeal, the court must consider whether the complained-of ruling was erroneous and whether the error affected a substantial right of the party affected. If not, a reversal is not warranted. The determination is whether the error, when compared to the entire record, has a substantial effect on the outcome of the case, and it is the complainant's burden to so prove. Simmons, supra .
The concept of substantial right, as used in Louisiana Code of Evidence article 103, is "akin to the harmless error doctrine applicable in both civil and criminal matters." Richardson v. Richardson , 07-0430 (La. App. 4 Cir. 12/28/07), 974 So.2d 761. Error has been defined as harmless when it is "trivial, formal, merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case." Buckbee v. United Gas , 561 So.2d 76 (La. 1990) ; Gerhardt v. Gerhardt , 46,463 (La. App. 2 Cir. 5/18/11), 70 So.3d 863. Prejudicial error "affects the final result of the case and works adversely to a substantial right of the party assigning it." Error is prejudicial when it consists of the exclusion of evidence related to a "material point in issue" and adversely affects the substantial rights of the party opposed to the exclusion. Buckbee, supra.
In a medical malpractice action, the plaintiff has the burden of proving: (1) the applicable standard of care, (2) that the standard of care was breached, and (3) that as a proximate result of the breach, the plaintiff sustained injuries that would not otherwise have been incurred. La. R.S. 9:2794(A) ; Patten v. Gayle , 46,453 (La. App. 2 Cir. 6/22/11), 69 So.3d 1180. The third element, causation, is subject to the manifest error standard of review. In a medical malpractice claim, great deference should be given to the factfinder when medical experts express different opinions relevant to causation. Patten, supra.
A court of appeal's review of a trial court's or jury's finding of fact is well settled, as detailed by the Louisiana Supreme court in Rosell v. ESCO , 549 So.2d 840 (La. 1989) :
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of *1244 fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong....
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. (citations omitted)
DISCUSSION
The defendants argue in their first assignment of error that the trial court erred in excluding credibility evidence during the cross-examination of Dr. Thoma. The defendants sought to question Dr. Thoma regarding his breach of the medical panel oath. We find that any error in refusing to allow the questioning of Dr. Thoma's medical panel involvement is harmless because it did not have any substantial effect on the outcome of the case.
When compared to the totality of the record, the error did not affect a substantial right of the defendants. Although we believe the trial court should have allowed the questioning regarding Dr. Thoma's medical panel oath, the error of excluding the evidence is harmless. The testimony that Dr. Thoma signed the medical panel oath before being retained as an expert did not relate to a material point of issue in the case. Dr. Thoma's medical review panel history in this case has no bearing on whether Dr. Tucker breached the standard of care and whether that breach was the proximate cause of Mr. Johnson's death.
The jury heard ample testimony from multiple doctors as to whether Dr. Tucker breached the standard of care. The defendants presented testimony from each member of the medical review panel member stating Dr. Tucker did not breach the standard of care. The defendants also offered the testimony of Dr. Schuler, who stated if Dr. Tucker did not think there was a blood clot in Mr. Johnson's leg, then not ordering an ultrasound was acceptable.
The plaintiff offered testimony from Dr. Thoma, who testified Dr. Tucker breached the standard of care taught to emergency room physicians. Plaintiff also presented testimony from Dr. Happle, who stated PE should have been considered in the differential diagnosis of Mr. Johnson. Dr. Tucker testified that although he did not write it down, he considered PE when diagnosing Mr. Johnson, but dismissed it because he felt other conditions better explained the symptoms. Dr. Happle further testified that even if there is a low suspicion of PE, the D-dimer test should be performed.
*1245 After hearing all the experts' opinions, the jury was unanimous in its decision that Dr. Tucker breached the applicable standard of care and that breach caused the death of Mr. Johnson. The fact that Dr. Thoma signed an oath for a panel on which he did not ultimately serve would not have had a substantial impact on the jury's unanimous decision. Considering the entire record, any error by the trial court in excluding the evidence is harmless. Therefore, a reversal is not warranted.
The appellants argue in their second assignment of error that the jury was manifestly erroneous in accepting Dr. Thoma's testimony concerning the standard of care and rejecting the testimony of four other medical experts. We do not agree with this argument. Dr. Thoma's opinion was that Dr. Tucker did not comply with the standard of care that is taught to emergency room physicians. As stated above, Dr. Thoma was not the only expert who believed further testing should have been ordered. Dr. Happle stated that even if there is only a low suspicion of PE, the D-dimer test should have been ordered.
The jury listened to conflicting testimonies as to the applicable standard of care and whether Dr. Tucker breached that standard of care. The jury had a choice between two permissible views of the evidence. Either Dr. Tucker breached the applicable standard of care by not ordering further tests, or the standard of care did not require the ordering of further tests. The jury chose the view that further tests should have been ordered.
According to Rosell, supra , the jury is permitted to credit the testimony of Dr. Thoma over the testimony of other witnesses. In ruling in favor of Mrs. Johnson, the jury found Dr. Thoma's expert testimony to be credible. Dr. Thoma's testimony was not contradicted by any objective evidence. Dr. Thoma's background includes both practicing and teaching emergency room medicine. His testimony was not so implausible on its face that a reasonable factfinder would not credit it. After reviewing the record, it was reasonable for the jury to accept the view that Dr. Tucker breached the standard of care and that breach was the proximate cause of Mr. Johnson's death.
CONCLUSION
For the reasons stated above, we affirm the trial court. We do not find the trial court committed a reversible error by excluding Dr. Thoma's medical panel history in this case. Any error by the trial court in excluding the evidence does not affect a substantial right of the appellant. A reversal is not warranted.
We do not find the jury was manifestly erroneous in accepting Dr. Thoma's testimony concerning the standard of care. The jury had a choice between two permissible views of the evidence. We do not find any manifest error in the jury's determination that Dr. Tucker breached the applicable standard of care and that breach was the proximate cause of Mr. Johnson's death. Costs associated with this appeal are assessed to the appellants.
AFFIRMED.