STEPHENS, J.
Defendants, Eldorado Casino Shreveport Joint Venture, L.L.C., Eldorado Shreveport # 1, L.L.C., and Eldorado Shreveport # 2, L.L.C. (collectively "Eldorado"), appeal the denial of a motion in limine and judgment in the First Judicial District Court, Parish of Caddo, State of Louisiana, awarding damages to plaintiff, Yasheka Jack ("Jack"). For the following reasons, we affirm the judgment of the trial court.
FACTS AND PROCEDURAL HISTORY
This matter arises out of injuries sustained by Jack at the Eldorado Casino in Shreveport, Louisiana, and the subsequent suit for damages filed against Eldorado. Jack's injury occurred on November 9, 2013, when a beverage server employed by Eldorado, Denise Ramone, spilled hot coffee on Jack, which caused Jack to twist suddenly out of the chair on which she was seated and injure her back in the process. Jack filed a petition for damages against Eldorado on October 3, 2014. Eldorado answered and asserted several affirmative defenses, notably which Jack's injuries were proximately caused by a person or entity other than Eldorado.
Prior to trial, Eldorado filed a motion in limine seeking to exclude from evidence the portions of Jack's medical expenses that were written off, claiming Jack never actually incurred or had an obligation to pay the full amount of the expenses, and thus, the collateral source rule does not apply. The trial court denied Eldorado's motion, holding the collateral source rule does apply to write-offs negotiated by Jack's private insurance provider, to whom she had paid monthly premiums. Accordingly, Jack's medical records that were admitted into evidence during the trial were redacted to exclude the amount of the insurance payments and write-offs and, thus, reflected the full amount of medical expenses charged to Jack. Following the ruling on its motion, Eldorado failed to proffer into evidence any proof or information regarding the specific amounts of the write-offs.
*602 Trial commenced on September 11, 2017, wherein 11 witnesses testified. Following the conclusion of testimony, Jack moved for a directed verdict on comparative fault regarding Eldorado's affirmative defense of negligence on the part of an unknown patron. The motion was denied.
On September 14, 2017, a unanimous 12-person jury found Ramone was negligent, her negligence was a proximate cause of Jack's injuries, and the unknown patron was not negligent. The jury assessed 100% of the fault to Ramone and made the following award to Jack:
Past medical expenses $237,124.79 Future medical expenses 577,698.00 Past lost wages 51,646.00 Future lost wages 317,460.00 Past physical pain and suffering 40,000.00 Future physical pain and suffering 60,000.00 Past mental pain and suffering 75,000.00 Future mental pain and suffering 50,000.00 Past loss of enjoyment of life 10,000.00 Future loss of enjoyment of life 10,000.00 Disability 0.00 Scarring 1,000.00
The trial court rendered judgment in the total amount of $1,429,928.70.[1]
Eldorado subsequently filed a motion for judgment notwithstanding the verdict, which was denied. In ruling on the motion, the trial court noted that with regard to the issues of both fault and future lost wages, the jury had simply made a credibility call which it would not disturb on the basis of its own opinion of the evidence. Furthermore, in denying the portion of Eldorado's motion that requested a reduction to the jury's award for past medical expenses in an amount equal to the write-offs, the trial court noted there was no evidence in the record regarding the specific amounts of the write-offs; therefore, even if it were inclined to reduce the award by those amounts, it would not "guestimate" what those written-off amounts would be.
Eldorado now appeals the judgment of the trial court and asserts three assignments of error pertaining to (1) the assessment of 100% fault to Ramone; (2) the award for future lost wages; and (3) the trial court's application of the collateral source rule to the insurer-negotiated write-offs.
DISCUSSION
Eldorado's first two assignments of error involve the jury's assessment of the credibility of witnesses. When findings are based on determinations regarding the *603 credibility of witnesses, the manifest error standard demands great deference to the trial court's findings. Robinson v. Board of Supervisors for Univ. of La. Sys. , 2016-2145 (La. 6/29/17), 225 So.3d 424 ; Fuller v. Bissell , 51,759 (La. App. 2 Cir. 1/10/18), 245 So.3d 1169. Under manifest error review, the trial court's factual findings can be reversed only if the appellate court finds, based on the entire record, no reasonable factual basis for the factual finding and the factfinder is clearly wrong. Baker v. PHC-Minden L.P. , 2014-2243 (La. 5/5/15), 167 So.3d 528 ; Fuller , supra . Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, then the court of appeal may find manifest error or plain wrongness even in a finding based on credibility. But where such factors are not present, and the factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO , 549 So.2d 840 (La. 1989) ; Johnson v. Tucker , 51,723 (La. App. 2 Cir. 11/15/17), 243 So.3d 1237, writs denied , 2017-2075, 2017-2073 (La. 2/9/18), 236 So.3d 1262 and 1266.
Assessment of Fault
In its first assignment of error, Eldorado asserts the jury erred in assessing 100% of fault to Ramone, thereby refusing to accept as credible the uncontradicted testimony of Ramone regarding the cause of the accident. We disagree. A trial court's findings regarding percentages of fault are factual, and will not be disturbed on appeal unless clearly wrong. Purvis v. Grant Parish School Bd., 2013-1424 (La. 2/14/14), 144 So.3d 922, 926.
Overview of relevant testimony
Jack testified that on the night her injury occurred, she had met her two aunts, Mary Williams and Tolonia Bryant, at the Eldorado Casino. The three were sitting in chairs at the penny slot machines. Jack and Williams were sitting side by side with an empty chair between them, while Bryant was sitting across the aisle with her back to the machine, facing Jack and Williams. Jack stated there was suddenly a very hot sensation going down her back, saturating her pants and chair. She jumped out of the chair, turned and threw her body out to get her back off the chair. Jack identified the Eldorado waitress seated at the defense table, Ramone, as the waitress who spilled the hot coffee on her. Jack stated Ramone gave no explanation regarding what caused her to spill the drinks on Jack. Ramone just kept apologizing and asked if Jack wanted her to get her supervisor. Jack testified that no one who appeared to be a fellow Eldorado patron approached afterwards. On cross-examination, Jack testified that at the time her injury occurred, she did not see what caused Ramone to spill the tray of drinks because she was looking in the other direction and she does not know if someone bumped into her or not.
Ramone then testified on cross-examination that it is part of her responsibility as a cocktail waitress at the Eldorado Casino to organize drinks on her tray using a certain method in order to ensure the tray is well balanced and avoid spilling the drinks. This method requires that in the event there is hot coffee on the tray, it should be placed in the dead center with the heavier drinks immediately around it and the lighter drinks along the edges of the tray. Ramone further testified it was her responsibility and part of her training to be aware of rowdy patrons and prepared to avoid their sudden movements. She stated *604 patrons were expected to be rowdy, and it was normal and reasonable for them to make sudden movements such as jumping out of their chair.
Regarding the moments leading up to Jack's injury, Ramone testified the coffee still had steam rolling off it, and while it started out in the center of her tray, as is protocol, she was not sure whether it was still in the center of the tray at the time of the accident because she had delivered several drinks and picked up several empty glasses since originally organizing her tray. She testified that when she entered the aisle, Jack was seated on the left side and there was another patron whose identity is unknown seated on the right side. Ramone testified the unknown patron stood from her chair causing the chair to slide backward and the back of the chair to bump into Ramone's right hip. This bump then caused her to lose her balance and the balance of the tray and stumble forward, to the left, toward Jack. This movement caused the drinks on her tray to topple over in a domino effect and the hot coffee to spill over the side of the tray onto Jack. Ramone explained that the unknown patron's action of pushing her chair back was neither unusual nor unreasonable, but there was no way for her to anticipate the bump and avoid it. She testified that following the accident, the unknown patron attempted to help her clean up the mess made by the spilled drinks.
Surveillance video of the incident was played for Ramone, and still shots from the video were provided. She testified that the video quality was not clear, but she was able to identify the position of the parties leading up to and after the accident. However, Ramone testified the video did not show the accident but showed both immediately before and after the accident; in other words, the casino's surveillance video does not contain the precise footage which should have captured the incident. On direct examination, Ramone testified she did not get the name or contact information of the unknown patron because she thought it was unnecessary.
Mary Williams testified that she was with Jack at the casino on the night her injury occurred; Williams' sister, Tolonia Bryant, was also with them. Williams identified the still shot of the Eldorado surveillance video from before the accident and confirmed where she and Jack were sitting but testified she could not recall exactly where Bryant was sitting and that the quality of the photo was not clear enough to identify each individual. Williams also testified she did not see anyone who was not an Eldorado employee come up to the scene following the accident and indicate being the cause of the accident. On cross-examination, Williams confirmed she did not see what caused Ramone to spill her tray of drinks.
Tolonia Bryant testified that she was at the Eldorado Casino with Williams and Jack on the night Jack was injured, and she was sitting behind them, across the aisle. She had her back to the slot machine and was sitting facing Williams and Jack. Bryant testified she saw Ramone stumble and spill the drinks on Jack. Bryant further testified she did not see anyone bump into Ramone or anyone come up after the accident and apologize or indicate they caused Ramone to trip and fall. She was reading a book while talking with Jack and Williams and had looked down a little before the accident, but when she looked up, she saw Ramone walking toward them with a tray of drinks. She never saw anyone bump into Ramone, whom she described as just suddenly tripping. On cross-examination, Bryant testified that while she did not see anyone bump into Ramone, she does not know if someone did.
*605 Analysis
The record in this case demonstrates the jury was not manifestly erroneous or clearly wrong when it determined Eldorado was 100% at fault for the injuries sustained by Jack at the Eldorado Casino. Eldorado asserts Ramone's testimony was uncontradicted and does not support a finding of 100% fault against Eldorado, yet the surveillance video and testimony of other witnesses did contradict Ramone's assertions-both that she was bumped into by an unknown patron which caused her to lose her balance and led to the accident and that an unknown patron attempted to help clean up after Ramone's tray spilled onto Jack. Bryant and Williams both testified that while they saw Ramone stumble and spill the coffee on Jack, they saw no one bump into her. Furthermore, they both, as well as Jack, testified they saw no other patron take responsibility for causing Ramone to stumble or attempt to assist after the accident. Their testimony was not so implausible on its face that a reasonable factfinder would not credit it, nor was it contradicted by any objective evidence. In fact, the theoretically objective surveillance video provided by Eldorado that could have potentially supported Ramone's testimony, instead, further weighs against Eldorado's credibility due to its poor quality and suspicious omission of the accident altogether.
We note Eldorado assigned error to the jury's assessment of 100% fault to Eldorado but did not assign error to the jury's finding that the unknown patron was not negligent. Regardless, the jury clearly found Jack and her witnesses to be more credible and resolved conflicts of testimony in Jack's favor. Its finding that Eldorado was 100% at fault for the injuries sustained by Jack, and that the unknown patron was not, is reasonable in light of the record reviewed in its entirety. This assignment of error is without merit.
Award for Future Lost Wages
Eldorado asserts the jury erred in awarding future lost wages in light of overwhelming evidence that Jack could return to work with accommodations. We disagree. Awards for loss of earning capacity are inherently speculative and insusceptible of calculation with mathematical certainty. Shephard v. AIX Energy, Inc. , 51,965 (La. App. 2 Cir. 5/23/18), 249 So.3d 194, 211, writ denied , 2018-1266 (La. 11/5/18), 255 So.3d 1050. The trier of fact is accorded great discretion in assessing damages for loss of earning capacity, but there must be a factual basis in the record for the award. Id.
Overview of relevant testimony
Jack testified that at the time of her injury, she was the office manager at Velocity Care, a medical office where she had been employed for two years. She earned a yearly salary of approximately $33,000 and was a single mother of three. Jack's prior work history includes working in a hospital as a unit clerk, patient care technician, and certified nursing assistant, as well as a receptionist, medical coder, and customer service representative at a retail store. She has a high school diploma and at the time of her injury was enrolled in community college pursuing an associate degree in business administration. Ultimately, however, Jack failed those classes due to the pain she suffered from her injury at Eldorado.
Jack testified she worked 12-hour shifts at Velocity Care and had no difficulty performing work duties prior to her injury. Her duties included working side-by-side with the front desk staff and managing them; meeting and greeting patients; answering the phone and placing calls; sitting for long periods of time to send out emails *606 to billing companies, supervisors, and owners; coordinating the staffing schedule; putting away supplies; moving charts; retrieving patients from cars and helping them into a wheelchair; taking vital signs; and making beds. She testified she did whatever needed to be done.
In November 2015, due to her continued pain and upon the recommendation of Dr. Euby Kerr, M.D., at the Spine Institute, Jack underwent a two-level, 360-degree lumbar fusion surgery. Jack had three discs removed from her spine, which were replaced with artificial discs that were screwed into her spine. Since the surgery, Jack continues to experience pain and pressure in her lower back. She explained her pain level increases as her activity level increases and stated she continues to receive injections in her sacroiliac joints. Jack further testified that as of the date of trial, she had not been released by her doctor to return to work but she would if she could because she enjoyed her job, was good at it, and needed the income.
Jack testified that she currently experiences difficulty getting comfortable, either sitting, standing, or lying down, and constantly has to shift. She testified her injury prevented her from performing her previous duties at Velocity Care due to the extended periods of sitting, standing, bending, lifting, and reaching that were required and the pain those activities caused her. In order to do her job at Velocity Care, Jack needed someone to help with those tasks, which assistance, she testified, she probably would not be able to get. Jack stated it made no sense for her to be there, basically, because Velocity Care would have to have someone shadow her when, instead, they could just pay that one person to do the job.
On cross-examination, Jack testified she last worked in October 2015, has not been released by Dr. Kerr to return to work, and had not seen Dr. Kerr since December 2016. She confirmed she never asked her employer for any help or accommodations to continue work and had not applied for any other jobs. She did testify, however, that she had applied for Social Security disability and had been denied.
The video deposition of Dr. Kerr was taken during litigation and played for the jury at trial. He was accepted as an expert in the field of orthopedic surgery with a specialty in treatment of spine damage. Dr. Kerr testified he has treated Jack and first saw her as a patient in July 2014. Dr. Kerr reviewed MRIs of Jack's spine, performed a physical examination and diagnostic testing, and subsequently diagnosed her with a disk bulge at L5-S1 and an annular tear at L4-5. Dr. Kerr explained his ultimate course of treatment was to perform a 2-level 360-degree lumbar fusion on Jack, which he accomplished on November 20, 2015. He discussed the nature and mechanism of the pain caused by Jack's spinal injuries. He testified the surgery was successful and without it, Jack's tear and bulge would not have healed on its own, but normally this type of procedure only provides about 70-75% relief. Following the procedure, Dr. Kerr recommended Jack undergo sacroiliac injections and also referred her to pain management. He testified Jack was still experiencing pain associated with her injury at the Eldorado Casino and she may need another surgery in the future to address it.
The video deposition of Dr. Larry Stokes, Ph.D., was taken during litigation and played for the jury at trial. He was accepted as an expert in both vocational rehabilitation counseling and life care planning. Dr. Stokes performed a vocational rehabilitation assessment and life care plan on Jack. He conducted a two-hour interview with her and approximately two hours of testing. He testified regarding *607 Jack's education and job experience, as well as her reported pain and mobility and the fact she has to rely on her children for help completing activities of daily living, including personal care and household work. He reported he had reviewed Jack's medical records, the deposition of Dr. Kerr, and the report by the vocational rehabilitation counselor hired by Eldorado. Dr. Stokes testified he had spoken with Dr. Kerr on the phone regarding Jack's condition. Dr. Stokes performed an employability assessment to determine what kind of jobs Jack could perform before and after the accident and concluded the job she had at Velocity Care, where she earned $33,000 per year including benefits, was the highest form of employment she had held and she was earning at her capability/capacity while there. He further testified that no doctor has released her to work, and Dr. Kerr reported to him that Jack was in too much pain to work. Dr. Stokes testified he did not believe Jack was employable at the time of trial and more likely than not, she would not be able to return to work in her capacity as an office manager at Velocity Care. He explained Jack currently has no earning capacity because no one has said she can go back to any kind of work, so she was looking at a 100% loss in earning for the remainder of her work life expectancy.
When asked to look on the "bright side," Dr. Stokes testified that hopefully, the most Jack could probably do would be part-time, light office management work, at approximately 20 hours per week. He provided a list of jobs he felt Jack could possibly perform part-time in the future, which included an office clerk or receptionist, office manager, administrative assistant, telephone clerk, and/or ticket taker. He further testified her earning capacity at any of these type of jobs would be between $8,507 and $11,242, which would, at the most optimistic estimate, still give Jack a loss of earning capacity between $21,757 and $24,492 per year. Dr. Stokes explained that since Jack was still in treatment and trying to improve as well as get additional education, he did not know what Jack's ultimate outcome would be, particularly if she could get to a point to where she could work in the future. He further testified that upon reviewing the report of Dr. Carl Goodman, the independent medical examiner hired by Eldorado, he noted Dr. Goodman did not opine whether or not Jack could work. Dr. Stokes stated he had also reviewed the report of Steve Allison, the physical therapist hired by Eldorado to perform the functional capacity evaluation ("FCE") of Jack, and the report ultimately concluded Jack did not have the residual functional capacity to safely perform full or unrestricted light or sedentary work. He explained there are only five categories of work: sedentary, light, medium, heavy, and very heavy, and that sedentary is the easiest physically demanding work, mostly sitting, some standing and walking, with very little lifting. He explained Allison's report confirmed the beliefs he already had-Jack would have to have significant modifications to her work setting to be able to work regularly and maintain work. Dr. Stokes testified that Allison's report indicated he repeatedly had to stop the test he was administrating on Jack because she could not safely perform the task. Dr. Stokes stated that ultimately both Allison's and Dr. Goodman's reports supported his own position regarding Jack.
On cross-examination in his deposition, Dr. Stokes testified that he is not a medical doctor and did not perform a physical examination of Jack. He stated his opinion of Jack's physical restrictions was based on the information provided to him by Dr. Kerr and Jack and on the results of the FCE performed by Allison, but he did not *608 have an independent opinion about how long Jack's physical limitations may last.
The video deposition of John W. Theriot was taken during litigation and played for the jury at trial. Theriot was accepted as an expert in forensic economics, forensic accounting, and economic loss valuation. He testified in his deposition that he had reviewed Jack's earning records from 2008 to 2016, Dr. Stokes' report, Jack's deposition, and the deposition of Dr. Kerr, and then compiled an economic loss report based on that information. The report calculated how much of her salary Jack lost and would lose in the future due to her injury. Theriot testified that to calculate Jack's future lost income, he used a generally accepted table that was published in the Journal of Forensic Economics, which calculated work life expectancy based on information provided. Theriot testified that in Jack's case, her work life expectancy was 19.24 years, which he thought was very reasonable because Jack was only 41 at the time of trial. He then multiplied 19.24 by the base wage of $39,766, which was the salary Dr. Stokes reported Jack would have been able to earn had she not been injured and could have completed her associate degree.
This method brought Theriot to the conclusion that if Jack was unable to return to work, considering discounts to account for investment earnings and inflation, her future lost earnings would be $692,802. Using the same method applied to the amount of $11,242 that Dr. Stokes had reported Jack could earn working 20 hours a week, Theriot also calculated that Jack would sustain a future loss of earnings totaling $496,945 if she were able to return to work part time. Likewise, Theriot testified that assuming Jack could return to work full time making $22,485 per year, her future lost earnings would be $301,069. Using the base wage of $33,000 instead of the base wage Jack could have earned had she completed her associate degree, Theriot concluded Jack's future lost wages would be: $574,925 if she did not return to work; $379,067 if she returned part time making $11,242; and, $183,192 if she returned full time earning $22,485. Theriot testified the work life table he used was the standard and most recent table, at five years old. Theriot took issue with Eldorado's economist, who instead, used the average of eight different tables, including the one Theriot used, but who also included a table that was 20 years old and four others that ranged from 11 to 16 years old. Theriot testified on cross-examination in his deposition that when making his calculations for future lost wages, he deferred to the vocational experts with regard to whether or not Jack could return to work.
The defense's witnesses then testified. Dr. Carl Goodman was accepted as an expert in orthopedic medicine and testified he was hired by Eldorado to perform an independent medical examination of Jack. He testified the methodology of his independent medical examinations consists of taking a history from the patient, conducting a physical examination, and reviewing medical records. He testified that it was his opinion Jack could have suffered a small annular tear in her back as a result of the subject incident. He explained that while he believed Jack was obviously having pain, other than medication for the pain, he did not believe she needed any more treatment, including but not limited to a future surgery or steroid injections.
On cross-examination, Dr. Goodman testified that due to the back injuries Jack sustained at the Eldorado Casino, Jack would have difficulty doing her job working as an office manager at Velocity Care, sitting or standing for eight hours at a time, and turning quickly. As a result, she would likely miss time from work in the *609 future. He agreed that to a reasonable medical probability, Jack sustained a permanent injury as a result of the accident at the Eldorado Casino.
Dr. Steve Allison was accepted as an expert in functional capacity evaluations and testified that his FCE of Jack included an interview regarding how the injury occurred, symptoms, and treatment; a review of multiple documents including medical records from Dr. Kerr and Dr. Goodman, MRI, X-ray, and CT reports, a deposition report from Velocity Care, and an economic loss report; a physical examination which consisted of tests measuring range of motion, reflexes, muscle atrophy, and sensation; and, a functional test which assessed safe tolerances to do things such as lift, push, and pull objects of various weights. Dr. Allison testified he found Jack had a moderate limp, all four motions tested with the lumbar spine were limited and painful, and she had diminished sensation in her left leg.
Dr. Allison further testified Jack did have some limitations evident in the functional test, but he thought she could return to work full time performing sedentary to light work with restrictions. He testified Jack could tolerate sitting a maximum of 5.25 hours a day but not for more than one hour at a time without getting up and walking around. Dr. Allison testified that with accommodations, Jack could perform the job of office manager, but the physical demands of a specific occupation often vary from job to job. He testified that as Jack described her duties at Velocity Care, she was performing medium work rather than sedentary or light, which he attributed, in part, to her account that she was required to move boxes of paper. He testified that to return to her former job at Velocity Care, Jack would need accommodations for sitting, standing, walking, carrying and lifting boxes of paper, pushing and pulling a 4-wheel cart with boxes of files, and for physical activities such as stooping, squatting, and kneeling. He further testified that Jack's description of her duties at Velocity Care was consistent neither with his own experience of the duties of an office manager nor with how the dictionary of occupational titles classifies that occupation. Dr. Allison also testified Dr. Kerr typically accepted his recommendation as to whether one of his patients was able to return to work.
On cross-examination, Dr. Allison testified that based on the physical demands of office manager contained in the dictionary of occupational titles, Jack did not have the functional ability to perform 33% of the general job of office manager. However, he testified that based on the information provided by Jack regarding her duties as office manager at Velocity Care, specifically, she did not have the functional ability to perform 60% of her former duties at Velocity Care. He testified that more likely than not, Jack had reached maximum functional improvement with her injuries and the work restrictions being placed on her should be considered permanent.
Kristan Gilliam testified that she was the Director of Oversight and Management for Velocity Care. She testified she worked with Jack and at that time, she was the practice administrator and Jack's direct supervisor. She described Jack's general duties to be helping to train the receptionists, be there for the receptionists if they need anything, and taking care of any patient-related issues which could involve billing with their insurance or medical records. On cross-examination, Gilliam testified Jack was a reliable, prompt, well-respected employee who had good relationships with other employees and had never been reprimanded or received an unsatisfactory evaluation.
*610 Kenneth Brister was accepted as an expert in vocational rehabilitation and testified that he was hired by Eldorado to perform an assessment of Jack. He stated his assessment included a review of Jack's medical records, her Social Security Administration records, and multiple deposition transcripts, including that of Jack. He also interviewed Jack and obtained information regarding her educational background, work history, hobbies, special interests, details of the injury and medical treatment since, and problems she was continuing to have from a physical standpoint. After gathering pertinent information and reviewing pertinent documents, Brister then completed a transferable skills analysis to determine what types of jobs Jack would be able to do in the future based on the information obtained. Next, he conducted some limited vocational research to determine, based on the transferable skills analysis, what types of wages would be available to Jack in her geographical location.
Brister testified that based on his review of Dr. Allison's report and the medical information he understood to come from Dr. Kerr, it was his opinion Jack should be able to return to work in job positions designated as sedentary to light duty, with some limitations in both of those areas. He testified she could find a position that accommodated her limitations or engage in self-accommodating activities such as asking a coworker for assistance, or standing for a few minutes after sitting for a while. Brister testified the job of office manager typically would provide the flexibility to assign certain activities to other coworkers or do self-accommodating activities. He also stated employers have become more willing to provide accommodations to their employees. He testified that other than office manager, Jack could also perform the job of receptionist, unit clerk, and medical coder, which are all jobs Jack held prior to working as an office manager at Velocity Care. Additionally, he testified Jack could work as a medical secretary, general secretary, appointment clerk, information clerk, hospital admitting clerk, billing clerk, insurance clerk, loan clerk, and in dispatcher type positions.
On cross-examination, Brister testified he did not do a life care plan for Jack and had no opinion as to her future medical needs. He stated that while he had reviewed Dr. Goodman's deposition, he was not present for his live testimony at trial and did not know specifically how Dr. Goodman testified. Brister stated he had reviewed Dr. Goodman's report, but he did not rely on it or include it in his own report because Dr. Goodman's report did not contain an opinion regarding whether Jack could return to work. Furthermore, Brister testified Dr. Kerr's indication that Jack may need another surgery in the future was also not included in his report. He stated he was not sure if he had that information at the time of rendering his report, but if he did, it should have been included and its absence was an oversight. He testified his findings were also based on Dr. Allison's FCE and agreed that based on his findings, Jack had not been released to safely perform unrestricted sedentary work, which is the lowest physically demanding type of work.
He confirmed he had noted in his report that Jack had explained to him that even with self-accommodations at Velocity Care, her pain level was such that she could not perform her job. Brister testified his opinion was Jack had not suffered a loss of earning capacity. However, he further testified his opinion would likely change if both Jack's treating physician and the independent medical examiner indicated she could not return to work, in which case, she would have a loss of earning capacity. He also testified that if Jack could not get *611 her degree because of this accident, she would have a loss of future earning capacity.
Tim Shaughnessy was accepted as an expert economist and testified that he was hired by Eldorado to evaluate Jack's claim for damages. He explained his method for determining Jack's future lost wages required taking the difference between Jack's anticipated earning during her work life expectancy in the earning path she was in prior to her injury and the earning path that she was in after her injury. He then translated that difference into a present value that if put into a bank account where it would earn interest, would equal that difference over the span of Jack's work life. He testified that based on Brister's report and testimony, Jack has no loss of earning capacity; therefore, it was his opinion that she, accordingly, had no loss of future earnings.
Analysis
A review of the record in its entirety shows the jury's award for future lost wages was not manifestly erroneous or clearly wrong. Eldorado asserts the jury's award was in error due to the "overwhelming evidence" that Jack could return to work. The jury was in fact presented with an overwhelming amount of evidence at this trial from very educated, qualified, and experienced experts on both sides. While only that testimony relevant to the assignments of error has been summarized herein, we have reviewed the record in its entirety. The record clearly shows that Jack is still in treatment and striving to resolve her pain. There is simply no way for anyone to know what type of work she will be able to perform in the future. However, there is clearly a reasonable factual basis in the record to support the jury's award of future lost wages.
First, we note there was uncontroverted testimony that Jack is still experiencing pain, making it difficult, or impossible, for her to resume her former employment duties. There was no testimony showing Jack could return to unrestricted, full-time work without the necessity of accommodations in the form of self-accommodating activities, accommodations made by her employer, or assistance from coworkers. Instead, there was testimony from both sides that Jack can neither safely perform all her previous duties as office manager at Velocity Care, nor can she safely perform even the least physically demanding type of work-sedentary work-without restrictions and accommodations. Likewise, testimony from both sides showed that more likely than not, Jack's injury is permanent.
After hearing the ample expert testimony and relying on their testimony, the jury had a choice between two permissible views of the evidence: (1) Jack can go on to earn the same income she would have earned had she not been injured at the Eldorado Casino; or (2) she cannot. The jury was permitted to credit the testimony of Jack's experts over those of Eldorado and was absolutely reasonable in determining Jack will suffer lost wages in the future due to the effect her injuries sustained at the Eldorado Casino will, more likely than not, continue to have on her ability to work. We further note that the jury's award was less than half of the amount of Dr. Stokes' highest estimation of Jack's future lost earnings. Loss of earning capacity/future lost wages is an inherently speculative determination, thus the jury is given particularly great discretion in assessing those damages. In light of the record reviewed in its entirety, the jury's award of future lost wages to Jack was not manifestly erroneous or clearly wrong. This assignment of error is without merit.
Application of Collateral Source Rule to Insurer-Negotiated Write-Offs
In its third assignment of error, Eldorado asserts the trial court erred in *612 its application of the collateral source rule as to the written-off portion of Jack's past medical expenses. When a trial court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence. La. C.C.P. art. 1636(A). It is incumbent upon the party who contends its evidence was improperly excluded to make a proffer, and if it fails to do so, it waives the right to complain of the exclusion on appeal. Murphy v. Savannah, 51,906 (La. App. 2 Cir. 4/11/18), 246 So.3d 785.
Following the trial court's denial of its motion in limine, Eldorado made no proffer of Jack's unredacted medical bills or any other evidence of the amounts of the write-offs. Therefore, Eldorado waived its right to complain of this exclusion on appeal, and the issue of the trial court's application of the collateral source rule to the insurer-negotiated write-offs is not properly before this court. This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court in favor of the plaintiff, Yasheka Jack. All costs of appeal are assessed to the defendants, Eldorado Casino Shreveport Joint Venture, L.L.C., Eldorado Shreveport # 1, L.L.C., and Eldorado Shreveport # 2, L.L.C.
AFFIRMED.

The total amount of damages provided in the trial court's judgment does not mathematically align with the individual awards on the jury's verdict form. The correct total sum of all the damages awarded to Jack is $1,429,928.79.